**IN THE UNITED STATES DEFENDANT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| DANIELLE BOND, | ) |
| as Parent and Next of Friend of K.M., | ) |
| 3311 4th Street SE Unit C | ) |
| Washington, D.C. 20032 | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Case  No.: _____ |
| | ) Judge: |
| | ) Case Type: Education |
| | ) |
| | ) (Jury Trial Demanded) |
| FRIENDSHIP PUBLIC CHARTER | ) |
| SCHOOL TECHNOLOGY | ) Date Stamp: |
| PREPARATORY ACADEMY | ) |
| HIGH SCHOOL | ) |
| 1400 First St. NW Suite 300 | ) |
| Washington, D.C. 20001 | ) |
| | ) |
| FRIENDSHIP PUBLIC CHARTER | ) |
| SCHOOL TECHNOLOGY | ) |
| PREPARATORY ACADEMY | ) |
| MIDDLE SCHOOL | ) |
| 1400 First St. NW Suite 300 | ) |
| Washington, D.C. 20001 | ) |
| | ) |
| FRIENDSHIP PUBLIC CHARTER | ) |
| SCHOOL BOARD OF TRUSTEES | ) |
| Tamika Maultsby, Director | ) |
| 1400 First St. NW Suite 300 | ) |
| Washington, D.C. 20001 | ) |
| | ) |
| FRIENDSHIP PUBLIC CHARTER | ) |
| SCHOOL INC. | ) |
| REGISTERED AGENT: | ) |
| Donald L. Hense | ) |
| 1400 First St. NW Suite 300 | ) |
| Washington, D.C. 20001 | ) |
| Defendants. | ) |
| _____ | ) |

## **COMPLAINT**

COMES NOW Plaintiff Danielle Bond, (hereinafter, "Parent," "Ms. Bond," "Plaintiff D.B.,"

Plaintiff), as Parent and Next Friend of K.M., by and through the undersigned counsel, Stephenson

1

Harvey, Jr., Esquire and Keith L. Howard, Esquire, as a party aggrieved by a Hearing Officer ("H.O." or "HO") Decision ("Decision"), and requests that this Court determine the Decision was partially wrong, not regularly made with respect to some of the issues asserted, reverse the Decision on the relevant issues set forth under the Individuals with Disabilities Education Act ("IDEA"), issue judgment for Plaintiffs on all issues set forth, find that the Decision was partially flawed and clearly erroneous, and that the administrative findings therein were not regularly made, deem Plaintiffs the prevailing party and award K.M. ("the Student," "Student," "Plaintiff K.M.," "K.M.," "KM") compensatory education relief, declaratory relief, partial reversal of an Impartial Hearing Officer's Determination under the Individuals with Disabilities Education Act, and award Plaintiff Ms. Bond reasonable attorney's fees in the instant federal action, costs, expert fees and costs, and also reasonable attorney's fees, expert fees and costs for the underlying administrative litigation. Plaintiff D.B. and Plaintiff K.M. ("Plaintiffs") plead as follows:

## PRELIMINARY STATEMENT

1. K.M. by Parent and Next Friend of K.M., Danielle Bond files this complaint against Friendship Public Charter School Board of Trustees ("Defendant Board," or "Board"), Friendship Public Charter School Technology Preparatory Academy High School, Middle School ("Defendant FPCS," or "FPCS"), (collectively, "Defendants") for their failure to provide K.M. a free appropriate public education (FAPE), in violation of the Individuals with Disabilities Education Improvement Act ("IDEA") and corresponding state law.

2. Defendants, by and through persons acting under color of state law, deprived Plaintiffs of their federal constitutional rights in violation of 42 U.S.C. § 1983.

3. Plaintiffs were injured and are entitled to recover damages caused by Defendants' actions.

4. Hearing Officer reached a Decision far from the accepted norm of a fact-finding process, failed to apply the proper legal standard and conduct a proper legal analysis with respect to the asserted claims in the Due Process Complaint ("DPC"), made certain findings of facts that were not in accord and consistent with the evidence adduced at the administrative hearing, made incorrect

rulings during the administrative hearing whereby Parent and Student were seriously prejudiced and made substantive and procedural errors, as well as significant mistakes of law and fact in his written decision that it rendered said decision wrong, not regularly made, flawed, erroneous and severely prejudicial to the Parent and Student.

5.   A true and correct copy of the HO Decision is attached hereto as Ex. A.

## JURISDICTION & VENUE

6.   On October 12, 2021, Plaintiffs requested a due process hearing with the Defendant of Columbia Office of the State Superintendent of Education.

7.   The Due Process Hearing was convened on March 22, 2022, March 23, 2022, March 24, 2022 and March 25, 2022.

8.   The parties submitted written closing arguments on April 16, 2022.

9.   The Hearing Officer had jurisdiction over this matter pursuant to the IDEA, 20 U.S.C. § 1400 *et seq.*; the implementing regulations for IDEA, 34 C.F.R. Part 300; and Title V, Chapter E-30, of the District of Columbia Municipal Regulations ("D.C.M.R.").

10. This Court has jurisdiction of actions brought under 20 U.S.C. § 1415 pursuant to 20 U.S.C. §1415(i)(3)(A) without regard to the amount in controversy.

11. Venue is properly laid in the United States District Court for District of Columbia, as authorized by 28 U.S.C. § 1391, because Defendant Board is located within the District of Columbia and a substantial part of the acts or omissions giving rise to this complaint arose from events occurring within this judicial Defendant.

12. This Court has the authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure; 28 U.S.C. §§ 2201 and 2202; and 20 U.S.C. § 1682.

13. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, which gives federal district courts jurisdiction over all civil actions arising under the Constitution, laws, and treaties of the United States.

14. This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1343(a), which gives federal Defendant courts original jurisdiction over (a) any civil action authorized by law to be brought by any person to redress the deprivation, under color of any State Law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States; and (b) any civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of the civil rights.

15. This is an action arising under the laws of the United States and an action by Plaintiffs, who are aggrieved by the actions and inactions of Defendants and decisions of the Administrative Law Judge below pursuant to 20 U.S.C. § 1415(f), 20 U.S.C. § 1415(g).

16. This Complaint is timely filed under 20 U.S.C. § 1415(i)(2)(B) and which provides that any appeal of a due process decision must be filed in a Defendant court of the United States, within ninety (90) days of the date of decision by a hearing officer.

17. On April 24, 2022, the Honorable Hearing Officer, Mr. Coles B. Ruff, Jr., serving as a hearing officer ("H.O. Ruff") at the request of the District of Columbia Office of the State Superintendent of Education, issued a written Decision following a four-day due process hearing ("H.O. Decision"). The H.O. Decision set forth his Findings of Fact and Conclusions of Law in favor of Plaintiffs on one of the three issues that H.O. Ruff decided and against Defendants on two of the remaining issues. With regard to the issue of whether Defendants denied K.M. her rights pursuant to Section 504 and the ADA, H.O. Ruff determined the administrative tribunal did not have jurisdiction over that issue.

18. Plaintiffs have exhausted all appropriate administrative remedies.

4

A. **APPLICABLE LAW AND POLICY**

19. In 1955, the United States Supreme Court found unconstitutional the segregation of students based on race. *Brown v. Bd. of Ed. of Topeka, Shawnee Cnty., Kan.*, 347 U.S. 483, 495, 74 S. Ct. 686, 692, 98 L. Ed. 873 (1954), supplemented sub nom. *Brown v. Bd. of Educ. of Topeka, Kan.*, 349 U.S. 294, 75 S. Ct. 753, 99 L. Ed. 1083 (1955)  "We conclude that in the field of public education the doctrine of 'separate but equal' has no place. Separate educational facilities are inherently unequal. Therefore, we hold that the plaintiffs and others similarly situated for whom the actions have been brought are, by reason of the segregation complained of, deprived of the equal protection of the laws guaranteed by the Fourteenth Amendment." *Id*.

20. The Court further noted the following regarding segregation:

Today, education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms. *Brown v. Bd. of Ed. of Topeka, Shawnee Cnty., Kan.*, 347 U.S. 483, 493, 74 S. Ct. 686, 691, 98 L. Ed. 873 (1954), *supplemented sub nom. Brown v. Bd. of Educ. of Topeka, Kan.*, 349 U.S. 294, 75 S. Ct. 753, 99 L. Ed. 1083 (1955).

21. In *Mills v. Board of Education of the District of Columbia*, this Court noted that "the Board of Education has an obligation to provide whatever specialized instruction that will benefit the child. By failing to provide plaintiffs and their class the publicly supported specialized education to which they are entitled, the Board of Education violates the above statutes and its own regulations." *Mills v. Bd. of Ed. of D.C.*, 348 F. Supp. 866, 874 (D.D.C. 1972).

22. The Individuals with Disabilities Education Improvement Act of 2004 ("IDEA") requires that states make available a FAPE to all children with disabilities residing in the state. 20 U.S.C. § 1412(a)(1)(A). The IDEA sets forth procedural and substantive requirements to which Defendants must adhere to ensure that each child with a disability receives a FAPE. 20 U.S.C. § 1401 *et seq.*

23. The purposes of the IDEA include "ensur[ing] that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A).

24. Before Congress enacted the IDEA (previously known as the Education for all Handicapped Children Act of 1975), children with disabilities were completely excluded from the public school system in the United States. *See* 20 U.S.C. § 1400(c)(2).

25. One of the central mandates of the IDEA is to educate children with disabilities in the least restrictive environment (LRE), requiring:

> To the maximum extent appropriate, children with disabilities are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily. 20 U.S.C. § 1412(a)(5)(A).

26. When reauthorizing the IDEA in 2004, Congress found "the implementation of this chapter ha[d] been impeded by low expectations, and an insufficient focus on applying replicable research on proven methods of teaching and learning for children with disabilities," 20 U.S.C. § 1400(c)(4), and renewed its commitment to placing children with disabilities in the regular education environment. In doing so, Congress relied on "[a]lmost 30 years of research and experience . . . demonstrat[ing] that the education of children with disabilities

can be made more effective by . . . having high expectations for such children and ensuring their access to the general curriculum in the regular classroom, to the maximum extent possible." 20 U.S.C. § 1400(c)(5).

27. Defendants FPCS and Board, a local educational agency ("LEA"), must "ha[ve] in effect policies, procedures, and programs that are consistent with the State policies and procedures" established under the IDEA in providing for the education of children with disabilities within its jurisdiction. 20 U.S.C. § 1413(a)(1).

28. Pursuant to the IDEA, the District of Columbia set forth such policies and procedures in District of Columbia Official Code Title 38, Chapters 25, 25A, 25B, and 25C.

29. The IDEA requires the LEA to develop, review, and revise annually an individualized education program ("IEP") enabling each child with a disability in the LEA to receive a FAPE. 20 U.S.C. § 1412(a)(4); 34 C.F.R. § 300.112 (Westlaw current through 2020).

30. Among other things, the IEP must include "a statement of the child's present levels of academic achievement and functional performance," "a statement of measurable annual goals," "a description of how the child's progress toward meeting the annual goals . . . will be measured," "a statement of the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the child," and "an explanation to the extent, if any, to which the child will not participate with nondisabled children." 20 U.S.C. § 1414(d)(1)(A)(i); *see* 34 C.F.R. § 300.320 (Westlaw current through 2019).

31. The LEA must convene an IEP meeting at least annually to review the IEP "to determine whether the annual goals for the child are being achieved" and revise the IEP to address "[a]ny lack of expected progress towards the annual goals," "[t]he results of any reevaluation," "[i]nformation about the child provided to, or by, the parents," "[t]he child's anticipated needs," and "[o]ther matters." 34 C.F.R. § 300.324(b) (Westlaw current through 2019).

7

32. The IEP Team must include a representative of the public agency ("LEA representative") who is "qualified to provide, or supervise the provision of, specially designed instruction to meet the unique needs of children with disabilities," "knowledgeable about the general education curriculum," and "knowledgeable about the availability of resources of the public agency." 34 C.F.R. § 300.321(4) (Westlaw current through 2019).

33. The LEA must provide the parents with written notice ("Prior Written Notice" or "PWN") before the LEA proposes or refuses "to initiate or change the identification, evaluation, or educational placement of the child or provision of FAPE to the child." 20 U.S.C. § 1415(b)(3); 34 C.F.R. § 300.503(a)(Westlaw current through 2019). The IDEA requires that the PWN include certain information, including "a description of the action proposed or refused by the agency" and "an explanation of why the agency proposes or refuses to take the action and a description of each evaluation procedure, assessment, record, or report the agency used as a basis for the proposed or refused action." 20 U.S.C. § 1415(c)(1).

34. The LEA "must conduct a full and individual initial evaluation . . . before the initial provision of special education and related services to a child with a disability." 34 C.F.R. § 300.301(a)(Westlaw Current through 2019). At least once every three (3) years, the LEA must ensure that a reevaluation of the child is conducted "[i]f the public agency determines that the educational or related services needs, including improved academic achievement and functional performance, of the child warrant a reevaluation" or "[i]f the child's parent or teacher requests a reevaluation." 34 C.F.R. § 300.303(a)(Westlaw Current through 2020).

35. The IDEA mandates that for children with behaviors that impede their education or others, schools should "consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior." 20 U.S.C 1414(d)(3)(B)(i); 34 C.F.R. § 300.324(a)(2(i)(Westlaw Current through 2020).

36. The IDEA mandates the State Education Agency ("SEA") develop and submit a plan to the federal government providing assurances to the Secretary that the State has in effect policies and procedures to ensure compliance with the IDEA in areas including FAPE, full educational opportunity, individualized education program, least restrictive environment, and procedural safeguards. 20 U.S.C. § 1412(a).

37. The IDEA allows prevailing parties to receive attorney's fees in IDEA actions. 20 U.S.C. § 1415(i)(3)(B).

38. D.C. Code Ann. § 38-2571.03(7)(A) explicitly states that a prevailing party in an IDEA matter may be awarded expert witness fees as part of its costs.

39. A school district must comply with the contents of an IEP. *Wilson v. District of Columbia*, 770 F.Supp.2d 270, 275 (D.D.C.2011). This Court has identified when the IDEA is violated if an IEP is not followed as reflected below:

> The IDEA is violated when a school district deviates materially from a student's IEP. *Wilson v. District of Columbia*, 770 F.Supp.2d 270, 275 (D.D.C.2011) (citation omitted). A material failure occurs when there is more than a minor discrepancy between the services a school provides to a disabled child and the services required by that child's IEP. *Holman v. District of Columbia*, 153 F.Supp.3d 386, 389–90, No. 14–1836, 2016 WL 355066, at *2 (D.D.C.2016) (citing *Van Duyn ex rel. Van Duyn v. Baker Sch. Dist. 5J*, 502 F.3d 811, 822 (9th Cir.2007)). In other words, for the court to find a failure to implement an IEP, the school board or local authorities must have "failed to implement substantial or significant provisions of the IEP." *Wilson*, 770 F.Supp.2d at 274 (citing *Houston Indep. Sch. Dist. v. Bobby R.*, 200 F.3d 341, 349 (5th Cir.2000)). There is no requirement that the child suffer educational harm in order to find a violation; rather, the proportion of services mandated compared with those provided is "the crucial measure for purposes of determining whether there has been a material failure to implement" an IEP. *Holman*, 153 F.Supp.3d at 389–90, 2016 WL 355066 at *2 (citations omitted)." *James v. D.C.*, 194 F. Supp. 3d 131, 139 (D.D.C. 2016).

40. "The party challenging the hearing officer's ruling must 'at least take on the burden of persuading the court that the hearing officer was wrong,' and a court "upsetting the officer's decision must at least explain its basis for doing so." *Kerkam v. McKenzie*, 862 F.2d 884, 887 (D.C.Cir.1989). … And a decision "without reasoned and specific findings deserves little

9

deference." *Kerkam v. Superintendent, D.C. Pub. Schs.*, 931 F.2d 84, 87 (D.C.Cir.1991) (internal quotations omitted)." *Id*.

## THE PARTIES

41. PLAINTIFF KINELLE MICKENS ("Student," "KM," or "K.M.") is a citizen of the United States, who at the time of the violations alleged herein, resided with her mother, Danielle Bond in Washington, D.C. At all times relevant herein, Student was, and continues to be a minor, having been born in the year 2003. At the time of the violations of law alleged herein, Student was eligible for special education and related services under the IDEA and District of Columbia law.

42. Student is also a qualified individual with a disability within the meaning of all applicable statutes, including Section 504 and the ADA.

43. PLAINTIFF DANIELLE BOND ("Ms. Bond," "Plaintiff D.B.," "Parent") is a citizen of the United States, who at the time of the violations of law alleged herein, resided in Washington, D.C.

44. DEFENDANT FRIENDSHIP PUBLIC CHARTER HIGH SCHOOL ("Defendant FPCS") is an LEA as that phrase is used in the IDEA, 20 U.S.C. § 1401 *et seq.*, and the Family Educational Rights and Privacy Act ("FERPA"), and as such receives financial assistance from the United States Department of Education and is responsible for providing a FAPE to disabled children, including K.M., attending its public charter school. Defendant FPCS is responsible for providing school children, including K.M., full and equal access to the public educational programs and activities offered by Defendant FPCS in accordance with federal law and the District of Columbia laws. As a local governmental unit, Defendant FPCS is a "person" as defined by 42 U.S.C. § 1983 (2000). Defendant FPCS is a recipient of federal funds within the meaning of 20 U.S.C. § 1681. Defendant FPCS is governed by the laws of District of Columbia, the laws of the United States, and the Constitution of the United States in carrying out these duties and responsibilities.

45. DEFENDANT FRIENDSHIP PUBLIC CHARTER SCHOOL BOARD OF TRUSTEES

("Defendant Board") supervises and oversees the Defendant FPCS and must supervise the LEA.

Defendant Board is a recipient of federal funds within the meaning of 20 U.S.C. § 1681.

Defendant Board is governed by the laws of District of Columbia, the laws of the United States,

and the Constitution of the United States in carrying out these duties and responsibilities.

Defendant Board is responsible for providing school children, including K.M., full and equal

access to the public educational programs and activities offered by Defendant FPCS in

accordance with federal law and the Defendant of Columbia laws. As a local governmental unit,

Defendant Board is a "person" as defined by 42 U.S.C. § 1983 (2000). Defendant Board is a

recipient of federal funds within the meaning of 20 U.S.C. § 1681. Defendant Board is governed

by the laws of District of Columbia, the laws of the United States, and the Constitution of the

United States in carrying out these duties and responsibilities.

46. On October 12, 2021, the Plaintiffs filed a Due Process Complaint against Defendants asserting

the following two (2) issues: (1) Parent and Student were denied a free appropriate public

education ("FAPE") during the 2018-19, 2019-20, 2020-21 and 2021-22 school years and (2)

Defendants denied K.M. her rights pursuant to Section 504 ("section 504") of the Rehabilitation

Act and the Americans with Disabilities Act ("ADA").

47. The underlying litigation (case no. 2021-0165) was assigned to Hearing Officer Coles B. Ruff,

Esq.

48. The parties participated in a Prehearing Conference ("PHC") on November 24, 2021.

49. On November 12, 2021, H.O. provided a Pre-Hearing Order ("PHO") whereby he generated

thirty-two (32) issues to be adjudicated from the two issues outlined in K.M.'s DPC.

50. Plaintiff D.B. protested and filed a motion to revise the thirty-two (32) issues identified by H.O.

for adjudication.

51. A second PHC was held to discuss the thirty-two (32) issues and other items in the PHO.

11

52. At a PHC, H.O. Ruff informed the parties he did not have jurisdiction to consider issues raised in the DPC pursuant to section 504 and the ADA.

53. On December 12, 2021, Plaintiffs informed H.O. Ruff and Defendants by email they believed the sole issue before the Tribunal was whether Plaintiff was denied a FAPE during the 2019-20 and 2020-21 school years?

54. After the second Prehearing Conference, H.O. Ruff issued a pre-hearing order ("PHO") on December 6, 2021, and an updated PHO on March 15, 2022, where H.O. Ruff outlined the issues to be adjudicated as follows:

   a. Did Defendants deny Student a FAPE by failing to develop appropriate IEPs during the SY 2019-20 and SY 2020-21?

   b. Did Defendants deny Student a FAPE by failing to materially implement Student's IEP during SY 2019-20 and SY 2020-21?

   c. Did Defendants deny Student a FAPE during the SY 2019-20 and 2020-21 SY by denying K.M. an opportunity to meaningfully participate?

55. Plaintiffs did not waive any claims in the DPC.

56. The underlying administrative due process hearing in case # 2021-0165 was convened on March 22, 2022, March 23, 2022, March 24, 2022, and March 25, 2022.

57. The Hearing Officer Determination ("HOD" or "H.O. Decision") was issued on April 24, 2022.

58. H.O. Ruff issued the following Conclusions of Law: (1) Defendants did not sustain the burden of persuasion by a preponderance of the evidence that Student's April 15, 2020 IEP was appropriate and reasonably calculated to enable Student to make progress appropriate in light of the Student's circumstances.  But Defendants did sustain the burden of persuasion by a preponderance of the evidence with regard to the students April 2021 IEP; (2) Plaintiffs did not sustain burden of persuasion by the preponderance of the evidence that Defendants denied Student a FAPE by failing to materially implement K.M.'s IEP during SY 2019-20 and SY

2020-21.; (3) Plaintiffs did not sustain burden of persuasion by the preponderance of the evidence that Defendants denied Student a FAPE by denying Plaintiff D.B. an opportunity to meaningfully participate during SY 2019-20 and SY 2020-21.

59. H.O. Ruff made wrong and incorrect rulings during the hearing, as well as substantive errors and mistakes of law and facts in his HOD issued on April 24, 2022 which resulted in severe harm and prejudice to Plaintiff D.B. and K.M., and also resulted in an underlying administrative due process proceeding and a written H.O. Decision which was partially wrong, flawed and clearly erroneous related to the two issues not found in Plaintiffs' favor.  Therefore, H.O. Decision issued by H.O. Ruff should be partially overturned by this Court on the issues in which H.O. did not find in Plaintiffs favor.

## **COVID-19 CRISIS**

60. The U.S. Department of Education ("DOE") explained that students with disabilities have the right to equal access to the same educational opportunities as non-disabled students, including the provision of FAPE.  During COVID-19, LEAs were required to "ensure … each student with a disability [could] be provided the special education and related services identified in the student's IEP developed under the IDEA…" *See* U.S. Department of Education, *Questions and Answers on Providing Services to Children with Disabilities During the Coronavirus Disease 2019 Outbreak,* p. 2 (March 2020).

61. If IEP services were not implemented, a student's IEP team would be required to make an individualized determination as to whether compensatory services were needed under applicable standards and requirements. *Id.*

62. In the District of Columbia, "[w]here a school system fails to provide special education or related services, a student is entitled to compensatory education." *Holman v. District of Columbia*, 153 F. Supp. 3d 386, 390 (D.D.C. 2016), quoting *Walker v. District of Columbia*, 157 F.Supp.2d 11, 30 (D.D.C.2001) (citations omitted). "Compensatory

education consists of prospective services 'reasonably calculated to provide the educational benefits that likely would have accrued from special education services the school should have supplied in the first place.'" *Holman, supra*, quoting *Reid ex rel. Reid v. Defendant of Columbia*, 401 F.3d 516, 524 (D.C.Cir.2005).

## FACTUAL BACKGROUND

63. K.M. has been determined eligible for special education and relates services pursuant to the IDEA.

64. Plaintiff D.B. is not a special education teacher. Plaintiff D.B. has not received specialized training in special education law and procedure. Plaintiff D.B. was not aware of the special education violations identified in this complaint until undersigned counsel explained her rights to her related to the Defendant's failure to provide her child with some special education and related services during the 2020-21 school year.  Plaintiff D.B. has not received training on how to read and examine educational records, IEP progress reports, and was not aware that she would have to observe her daughter in a classroom setting to be deemed a credible witness.

65. The Defendants are aware that Plaintiff D.B. has her own mental health issues that impact her daily living. Despite having this knowledge, Defendants did not offer Plaintiff D.B. with related services such as parent training or counseling to allow her to support K.M. in accessing and obtaining special education and related services from the Defendants prior to March 13, 2020, or during the 2020-21 school year prompting Plaintiff D.B. to remove K.M. from FCPS.

66. For the 2021-22 school year, K.M. was a student at a District of Columbia Public School.

67. For the 2020-21 school year, K.M. was a 9th grader at FPCS.

68. For the 2019-20 school year, K.M. was an 8th grader at FPCS.

69. Pursuant to her Amended April 9, 2021, IEP, during the 2020-21 SY, K.M. was performing on a 1st-4th grade level in reading and significantly below grade level in math and written expression.

70. K.M. had an IEP for Emotional Disturbance until on or about April 9, 2021.

14

71. Defendant failed to provide the necessary supports and services related to her Emotional Disturbance and her needs associated with Emotional Disturbance during the 2019-20 and 2020-21 school years.

72. K.M. has been diagnosed with Emotional Disturbance; Specific Learning Disorder with Impairment in Math, Reading, Written Expression; Mild Borderline Intellectual Functioning; Persistent Depressive Disorder (Dysthymia), moderate with anxious distress; and Intellectual Disability.

73. K.M. was assessed at the MECCA Group, LLC in March 2019 and they prepared a May 14, 2019, psychoeducational Evaluation of K.M. where K.M. received a full-scale IQ score of 69. However, a formal adaptive behavior measure of K.M. was not included in the MECCA Group Psychological Evaluation of K.M. The Defendant did have evidence of K.M.'s adaptive behavioral deficits but failed to conduct a formal adaptive behavioral evaluation to determine if K.M. was eligible to receive special education and related services under the educational classification of mild Intellectual Disability.

74. During the initial evaluation of K.M. and after the March 2019 psychoeducational evaluation, K.M. did not receive a comprehensive speech-language evaluation despite having deficits in communication. K.M. did not receive a comprehensive speech-language evaluation until after Plaintiff D.B. specifically requested the evaluation in the spring of 2021 despite clearly having communication deficits identified as early as March 2019.

75. On or about March 9, 2021, K.M.'s requested updated education evaluations in Psychological, Educational, Adaptive Behavior, Occupational therapy with a focus on sensory, Speech-language services, and Behavior.

76. The Defendants did not conduct all of the requested evaluations and did not provide a cogent and responsive explanation as to why certain evaluations were not conducted, such as the occupational therapy, psychological, and educational evaluations.

77. On March 15, 21 & 26, 2021, FCPS conducted adaptive assessment evaluations of K.M.

78. K.M.'s classification went from Emotional Disturbance to Intellectual Disability.

79. Although K.M. obtained a full-scale IQ of 69 and meets the criteria for an educational classification of Intellectual Disability, K.M. was not initially considered by her IEP team for classification under the special education category of Intellectual Disability until on or about April 9, 2021

80. In My 2019, K.M.'s IEP classification was more appropriately identified as Intellectual Disability but the Defendants only classified her as Emotionally Disturbance.

81. K.M. struggles academically, emotionally, and socially. During the 2019-20 and 2020-21 SY's, K.M. performed significantly below grade level. K.M. did not show basic working knowledge of skills/concepts and seldom produced work of satisfactory quality in Reading, Writing & Language and Math.

82. Upon information and belief, during the 2019-20 SY, K.M.'s teacher commented that K.M. was functioning on an approximate second grade level and has not responded to interventions that have been implemented.

83. Defendant did not conduct a Functional Behavioral Assessment during the 2019-20 SY and most of the 2020-21 SY, to determine how to address K.M.'s behavioral needs despite receiving explicit recommendations from the MECCA Group's May 2019 Psychological Evaluation of K.M.

84. Defendant did not implement a Behavioral Intervention Plan to assist with K.M.'s behavioral needs during the 2019-20 and 2020-21 SYs.

85. K.M. has expressed suicidal ideation previously. In May 2019, the MECCA Group recommended for school staff to complete a safety plan with K.M. with strategies she can use to alleviate stress. Defendant did not sufficiently address these issues during the 2019-20 and 2020-21 SY's.

86. Upon information and belief, K.M. was not provided with speech language services during the 2019-20 SY and 2020-21 SY.

87. Despite K.M.'s regression and lack of academic progress during the 2018-19, 2019-20 and 2020-21 school years, K.M. was not provided with Extended School Year ("ESY") services during the summers of 2019, 2020 or 2021.

88. On or about March 9, 2021, Plaintiff D.B. requested K.M.'s cumulative file and special education records. Defendants did not provide Parent with the student's cumulative file and special education records during the 2020-21 SY, denying K.M.'s the ability to meaningfully participate in K.M.'s education.

89. K.M. was entitled to a dedicated aide during the 2020-21 SY but was not provided a dedicated aide by Defendants.

**EVALUATIONS**

**I.      Psychological Evaluation (2018-2019 school year)**

90. On March 6 and 9, 2019, Dashana Lane, M.Ed./Sheritta Rogers, Ed.D., of the MECCA Group, LLC conducted a Comprehensive Psychological Evaluation of K.M. and prepared a May 14, 2019, psychoeducational evaluation report about K.M. The evaluation addressed K.M.'s behavioral and academic concerns and several tests were administered to determine potential deficiencies.

91. As part of the psychoeducational evaluation for K.M. the Wechsler Intelligence Scale for Children ("WISC-V")  test was performed.

92. The WISC-V test determined the following:

| Scale | Composite Score | Percentile Rank | Qualitative Description |
|---|---|---|---|
| Verbal Comprehension | 7 | 4 | Very Low |

| Visual Spatial | 81 | 10 | Low Average |
|---|---|---|---|
| Fluid Reasoning | 82 | 12 | Low Average |
| Working Memory | 74 | 4 | Very Low |
| Processing Speed | 66 | 1 | Extremely Low |
| Full Scale IQ | 69 | 3 | Extremely Low |

93. K.M.'s overall cognitive skills measured by the WISC-V test, when compared to her same aged peers, fall within the Extremely Low Range, with a Full-Scale IQ score of 69 (third percentile).

94. The WISC-V test is divided into a number of subtests. A scaled score of 10 is considered Average. A scaled score of 13 to 15 indicates Above Average functioning, while 5 to 7 indicates Below Average functioning. K.M.'s subtest scores are Below Average as follows:

| Subtests Scores Summary | SS* | Percentile |
|---|---|---|
| **Verbal Comprehension** | | |
| Similarities | 6 | 9 |
| Vocabulary | 4 | 2 |
| **Visual Spatial** | | |
| Block Design | 6 | 9 |
| Visual Puzzles | 7 | 16 |
| **Fluid Reasoning** | | |
| Matrix Reasoning | 7 | 16 |
| Figure Weights | 7 | 16 |
| **Working Memory** | | |
| Digit Span | 5 | 5 |
| Picture Span | 6 | 9 |
| **Processing Speed** | | |
| Coding | 2 | |
| Symbol Search | 6 | 9 |

95. K.M.'s scored in Very Low range in the Verbal Comprehension subtest.

96. K.M.'s fluid reasoning subtest scores fell in the low average range.

97. In the area of working memory, K.M.'s subtest scores clustered in the Very low range.

98. K.M.'s performance on Processing Speed tasks fell within the Extremely Low Range. Low Processing Speed scores will impact K.M.s ability to complete tasks accurately and efficiently within the classroom setting.

**Educational Tests**

99. As part of the Psychological Evaluation, the Wechsler Individual Achievement Test-Third Edition ("WIAT-III") was also conducted to determine K.M.'s performance in areas including Reading, Mathematics, and Written language.

100.     The WIAT-III test determined the following:

Composite Score Summary

| Composite Scores | Standard Score | Percentile Rank | Qualitative Description |
|---|---|---|---|
| Math | 65 | 1 | Low |
| Reading | 74 | 4 | Below Average |
| Written Expression | 80 | 9 | Below Average |

101.     K.M.'s mathematic skills fell within the Low Range. K.M. demonstrated difficulty completing both basic and advanced mathematical operations with accuracy.

102.     K.M.'s overall performance in the area of Reading fell within the Below Average range. While K.M. demonstrated the ability to read familiar words out loud, she demonstrated difficulty with utilizing phonic skills, spelling skills, and understanding what she read.

103.     K.M.'s overall performance in the area of Written Expression fell within the Below Average Range. While K.M. demonstrated strength in spelling and sentence combining skills, she demonstrated significant difficulty when asked to generate her own sentences or to write an essay with a coherent thought pattern with the proper use of grammar, punctuation, and capitalizations.

Total Reading Subtest Score Summary

| Subtests | Standard Score | Percentile | Qualitative |
|---|---|---|---|
| Word Reading | 75 | 5 | Below Average |
| Pseudoword | 64 | 1 | Low |
| Basic Reading | 70 | 2 | Below Average |
| Reading | 75 | 5 | Below Average |
| Oral Reading | 92 | 30 | Average |
| Reading Comprehension & | 79 | 8 | Below Average |

Mathematics Subtest Score Summary

| Subtests | Standard Score | Percentile | Qualitative |
|---|---|---|---|
| Math Problem | 67 | 1 | Low |
| Numerical | 64 | 1 | Low |
| Math Fluency | 68 | 2 | Low |

Written Expression Subtest Score Summary

| Subtests | Standard Score | Percentile | Qualitative |
|---|---|---|---|
| Sentence | 92 | 5 | Average |
| Spelling | 87 | 19 | Average |
| Essay | 73 | 4 | Below Average |

104.    As part of the psychoeducational evaluation, the Behavior Assessment System for

Children – Third Edition (BASC-3) was conducted to assess K.M.'s social and emotional

functioning.

**Behavior and Social/Emotional Functioning**

105.     The BASC-3 is designed to assess behaviors and emotions in children and adolescents.

BASC-3 Rating Scales:

| Adaptive Scales (high scores indicate problematic levels of functioning) | Clinical Scales (low scores indicate possible problem areas. | T-Score Range |
|---|---|---|
| Very High | Clinically Significant | 70 and above |
| High | At-Risk | 60-69 |
| Average | Average | 41-59 |
| At-Risk | Low | 31-40 |
| Clinically Significant | Very Low | 30 and below |

106.     K.M.'s teacher completed a global measure of her behavioral functioning with the

BASC-3 and specific behavioral domains were measured. K.M.'s results are shown below:

| Composite Scores | T-Score | Description |
|---|---|---|
| Learning Problems | 71 | Clinically Significant |
| School Problems | 64 | At-Risk |
| Withdrawal | 67 | At-Risk |
| Adaptability | 31 | At-Risk |
| Social Skills | 35 | At-Risk |
| Leadership | 34 | At-Risk |
| Study Skills | 36 | At-Risk |
| Functional Communication | 26 | Clinically Significant |
| Overall Adaptive Skills | 30 | Clinically Significant |

107.     The scores indicate that K.M. displays difficulty comprehending and completing school work in a variety of academic areas as well as making friends and is sometimes unwilling to join group activity.

108.     Additionally, the scores indicate K.M.'s difficulty in adapting to difficulty situations, turning in assignments on time, making decisions, getting others to work effectively, seeking and finding information on her own and utilizing poor expressive and receptive communication skills.

109.     K.M.'s Overall Adaptive Skills scores indicate that K.M. would likely benefit from support services that employ strategies such as adaptive technology which will likely enable K.M to work at her own pace and could be used in tandem with individual or small group instruction to facilitate progress.

**Children Depression Inventory-Second Edition**

110.     As part of the Psychological Evaluation, K.M.'s teacher completed the Children's Depression Inventory-Second edition (CDI-2) which is used to assess the presence and severity of depressive symptoms in children aged 7-17 years.

111.     K.M.'s teacher's responses yielded Very Elevated ratings in the areas of Emotional Problems and Functional Problems. K.M.'s teacher indicated that K.M. often looks tired or fatigued, seems lonely, enjoys school, and is showing worse school performance than before.  She also indicated that K.M. often looks tearful, cranky or irritable, and has to push herself to do schoolwork and is regressing in her performance more than before.

112.     As part of the Psychological Evaluation, K.M.'s mother, Plaintiff D.B., completed the parent form of the CDI-2. Plaintiff D.B.'s responses yielded High Average ratings (T=64) in the area of Functional Problems. Plaintiff D.B. indicated that K.M. is often displaying worse school performance than before and some of the time looks sad, blames herself for things, is cranky or irritable, spends time with friends, and thinks she is ugly.

**Beck Depression Inventory, Second Edition**

113.        As part of the Psychological Evaluation, the Beck Depression Inventory, Second Edition (BDI-II) was used to assess K.M.'s current symptoms of depression.

114.        The BDI–II consists of 21 items and each item is a list of four statements arranged in increasing severity about a particular symptom of depression. Items on the BDI-II measure symptoms of weight loss/weight gain, changes in body image, somatic preoccupation, loss of energy, sleep difficulties, and decrease in pleasure. Scores on the BDI-II range from 0 to 63. Scores from 0 to 13 are classified as Minimal Depression, scores from 14 to 19 are classified as Mild Depression, scores from 20 to 28 are classified as Moderate Depression, and scores from 29 to 63 are classified as Severe Depression.

115.        K.M.'s score of 17 indicates that she experiences a mild amount of depressive symptomatology, but has revealed suicidal ideation. K.M. indicated that she feels sad much of the time, sees a lot of failures in her life, feels guilty over many things she has done, has lost confidence in herself, is more critical of herself, feels like crying but she can't, as well as she doesn't consider herself as worthwhile and useful as she used to, is irritable all time, and is too tired or fatigued to do a lot of the things she used to. Additionally, and consistent with previous reports of suicidal ideation, K.M. indicated that she would like to kill herself. When she was questioned further about this, she indicated that she did not have a current plan to do so and was able to list people (her grandmother and Godmother) that she would contact if she had these feelings again.

**Multidimensional Anxiety Scale for Children 2nd Edition**

116.        As part of the Psychological Evaluation, the Multidimensional Anxiety Scale for Children 2nd Edition (MASC2) was administered. The MASC2 is designed to assess anxiety dimensions in children and adolescents aged 8 to 19 years.

117.        The MASC 2 Indexes the range and severity of anxiety symptoms and is useful in the diagnosis of anxiety disorders.

118.     To quantify the anxiety related symptoms that K.M. may be experiencing K.M. and her

mother completed the MASC2.

119.     The MASC2 gives an overall total score which indicates the extent to which K.M. is

currently experiencing signs and symptoms of anxiety, as well as scales in the areas of

separation/anxiety, Generalized Anxiety Disorder index, social anxiety total,

humiliation/rejection, performance fears, obsessions/compulsions, physical symptoms such as

tense/restless and panic, as well as harm avoidance.

120.     K.M.'s scores indicate elevated levels of anxiety concerns as demonstrated through tense

and restless feelings provoked by social situations.

121.     K.M. noted several areas of elevated concerns on her self-report. K.M. specifically noted

that she "often" is afraid that others will make fun of her , worries about getting called on in

class, is afraid that other people will think she's stupid, avoids going places with her family,

worries about what other people will think of her, avoids watching scary movies and TV shows,

feels restless and on edge, tries to do everything exactly right, etc.

122.     K.M.'s mother Plaintiff D.B. indicate elevated levels of anxiety concerns for K.M.

Plaintiff D.B. indicated that K.M. "often" tries to do things exactly right, gets really upset about

dirt, germs, chemicals or sticky things, worries about other people laughing at her, etc.

123.     The psychoeducational evaluation revealed that K.M. demonstrates significant

impairment in reading comprehension, written expression and accurate or fluent math

calculations and math reasoning which are substantially below the expectations of someone her

age. K.M. has not been provided any tutoring support in reading, writing and math by

Defendants.

124.     K.M.'s depressed mood and social and emotional functioning have negatively impacted

her ability to avail herself to classroom instruction and overall academic achievement.  K.M. has

not been provided adequate counseling support by Defendant.

125.     The May 14, 2019 MECCA Psychological Evaluation made the following

recommendations to support K.M.'s ability to access academic material:

i.      The MDT should determine which disability primarily impacts her in the education setting to determine K.M. educational disability classification. It is vital that K.M.'s academic and emotional functioning be addressed in her educational programming.

ii.     Provide K.M. with school based behavioral support services which should include discussion around coping strategies, social skills and a focus on her strengths and interests.

iii.    K.M. would benefit from a pass to leave class and a marked safe space in the school that she can go to when she feels overwhelmed or requires a break from her current setting.

iv.     As K.M. has expressed suicidal ideation previously, K.M. would benefit from a school generated safety plan for K.M., which includes "safe" people she can talk to in school and strategies she can utilize to alleviate stress.

v.      K.M. would benefit from inclusion in small group academic intervention groups in the areas of Reading, Writing, and Mathematics.

vi.     K.M. would benefit from books in audio format to aid her understanding of text and increase her reading fluency.

vii.    K.M. would benefit from direct instruction on background knowledge: activating prior knowledge helps her make connections between what she already knows and what she is reading.

viii.   K.M. would benefit from the use of graphic organizers which helps students create an organized schema and connects their prior knowledge to the text they are reading. Graphic Organizers: are visual and spatial displays that facilitate teaching and learning by organizing key concepts.

ix.    K.M. would benefit from the use of concept maps, venn-diagrams and story mapping to address reading deficits.

x.    K.M. would benefit from explicit instruction on text structure which could benefit the student's comprehension of both narrative and expository texts and retrieval of information.

xi.    K.M. would benefit from the use of a paraphrasing strategy which facilitates the use of the student's own words to translate the main idea which would promote critical reading, ability to draw inferences, summarize information, and recall what she has read.

xii.    K.M. would benefit from reciprocal teaching which includes predicting, clarifying, questioning and summarizing information for K.M.

xiii.    K.M. would benefit from collaborative strategic reading (e.g., brainstorming and predicting, comprehension monitoring and clarifying, summarization and self-questioning).

xiv.    In solving Math problems, K.M. would benefit from the use of Schema-Broadening Instruction (problems belong to problem types) and apply solution strategies that match those schemas for the type of problem which promotes pattern or schema recognition.

xv.    In solving Math problems, K.M. would also benefit from the use of Solve it!:  which incorporates self-instruction, self-monitoring, and self-questioning when solving math problems. It involves seven cognitive processes: read, paraphrase, visualize, hypothesize, estimate, compute, and check.

xvi.     For written expression, K.M. would benefit from learning to write complete sentences and be taught formulas to write four types of sentences: simple, compound, complex, and compound complex.  She would also benefit from practice manipulating and rewriting simple sentences.

xvii.    For written expression K.M. would also benefit from a Self-Regulated Strategy Development Model which is designed to improve a student's cognitive skills. Students are explicitly taught planning or revising strategies along with procedures for regulating the use of these strategies. When teaching the strategy, teachers must discuss the strategy and model it for the students. Students must memorize the steps of the strategy and the mnemonics for remembering them. Students should practice using the strategy with teacher support before they can use the writing strategy independently.

xviii.   K.M. will benefit from the use of cooperative groups and reciprocal teaching to help with perspective taking and exposure to different problem-solving methods.

xix.     K.M.'s hard work and determination should be acknowledged and reinforced. This will be critical in facilitating her academic progress and maintaining her self-esteem.

126.    The above May 14, 2019 MECCA Group, LLC Psychological Evaluation recommendations made to support K.M.'s academic performance were not implemented by Defendants during the 2019-20 and 2020-21 SY's.  K.M. continued to suffer academically due to the Defendants failure to implement the recommendations.

**II.     Adaptive Assessment (2020-21 school year)**

127.    On March 15, 21 & 26, 2021, Defendants prepared an April 6, 2021 Adaptive Report on K.M. This report was intended to obtain information regarding K.M.'s current adaptive functioning.

128.      In order to gain additional information about K.M.'s adaptive skills, the Vineland Adaptive

Behavior Scales, Third Edition (Vineland-3) was given to her teachers and parent and the results

incorporated into the April 6, 2021 Adaptive Report.

129.      Pursuant to the Vineland-3, adaptive behavior refers to the proficiency with which a student

demonstrates standards of personal independence and social responsibility expected for their age

and cultural group.  This includes skills in areas related to motor and physical skills, independent

living/daily living skills (e.g., performing household tasks, eating, dressing, bathing),

communication skills (e.g., use of receptive and expressive language, understanding and providing

information orally, and written expression skills) and social competence (e.g., skills in establishing

friendships with peers and adults, following social rules, and social reasoning and comprehension).

Expected levels of adaptive behavior vary with age and cultural expectations.

130.      The Vineland-3 measures adaptive behaviors, which are the things that people need to do

to function in their everyday lives. These important everyday behaviors can be grouped into the

broad areas of communication, practical daily living skills, and relating to other people. The

specific adaptive behaviors that are needed change, as a child grows older and depends less on

the help of others, but at every age, certain behaviors and skills are expected in the home, school,

and community.

131.      Pursuant to the report, adaptively, K.M.'s abilities fell within the Moderately Low range

in the home setting and ranged from Adequate to Low in the school setting. Within the home

environment, Mrs. Bond reported in her assessment  that K.M. is more expressive than she is in

the school environment. When examining teacher responses, K.M. tended to shut down and/or

avoid the work she did not comprehend/lacked confidence in saying she does not understand

school work.

**ABC and Domain Score Summary**

| ABC | Mrs. Odifa Standard Score (SS) | Qualitative Descriptors | Ms. Adkins-Lewis Standard Score (SS) | Qualitative Descriptors | Mrs. Bond Standard Score (SS) | Qualitative Descriptors |
|---|---|---|---|---|---|---|
| Adaptive Behavior Composite | 79 | Moderately Low | 73 | Moderately Low | 80 | Moderately Low |
| **Domains** | | | | | | |
| Communication | 72 | Moderately Low | 65 | Low | 83 | Moderately Low |
| Daily Living Skills | 82 | Moderately Low | 72 | Moderately Low | 86 | Adequate |
| Socialization | 90 | Adequate | 86 | Adequate | 81 | Moderately Low |

Qualitative Descriptors

| Adaptive Level | Domain and ABC Standard Scores |
|---|---|
| High | 130 to 140 |
| Moderately High | 115 to 129 |

29

| Adequate | 86 to 114 |
|---|---|
| Moderately Low | 71 to 85 |
| Low | 20 to 70 |

132.     The Adaptive Behavior Composite (ABC) provides an overall summary measure of K.M.'s adaptive functioning. Based upon Plaintiff D.B.'s feedback, K.M.'s ABC standard score is 80, with a 90% confidence interval of 78 to 82. Her percentile rank of 9 means that her score was greater than or equal to 9% of individuals in K.M.'s age group in the Domain-Level Parent/Caregiver Form normative sample.

133.     The Communication domain measures how well K.M.'s exchanges information with others. This includes taking in information, expressing herself verbally, and reading and writing. Based upon Mrs. Bond's feedback, her Communication standard score is 83, with a 90% confidence interval of 80 to 86. These scores are Moderately Low.

134.     The Daily Living Skills domain assesses K.M.'s performance of the practical, everyday tasks of living that are appropriate for her age. Such tasks include various aspects of self-care (e.g., dressing, hygiene), helping around the home, and functioning in the community (e.g., buying things). Based upon Mrs. Bond's feedback, K.M.'s standard score for Daily Living Skills is 86, with a 90% confidence interval of 82 to 90 and a percentile rank of 18. These scores are Adequate.

135.     K.M.'s score for the Socialization domain reflects her functioning in social situations. This domain covers her interpersonal relationships, play and leisure activities, and coping skills in social situations. Based upon Mrs. Bond's feedback, K.M.'s socialization standard score is 81, with a 90% confidence interval of 78 to 84. The percentile rank is 10. These scores are Moderately Low.

136.     Based upon the feedback of General Education Teacher Ms. Adkins-Lewis, K.M.'s ABC standard score is 73, with a 90% confidence interval of 69 to 77. Her percentile rank of 4 means

that her score was greater than or equal to 4% of individuals in K.M.'s age group in the Comprehensive Teacher Form normative sample.

137.    K.M.'s Communication domain standard score is based on her scores on three subdomains: Receptive, Expressive, and Written. Based upon the feedback of Teacher Ms. Adkins-Lewis K.M..'s communication standard score is 65, with a 90% confidence interval of 60 to 70 and a percentile rank of 1.

138.    The Daily Living Skills domain assesses K.M.'s performance of the practical, everyday tasks of living that are appropriate in the school setting. Based upon the feedback of Teacher Ms. Adkins-Lewis, K.M.'s standard score for Daily Living Skills is 72, with a 90% confidence interval of 65 to 79 and a percentile rank of 3.

139.    K.M.'s score for the Socialization domain reflects her functioning in social situations. Based upon the feedback of Teacher Ms. Adkins-Lewis, K.M..'s socialization standard score is 86, with a 90% confidence interval of 82 to 90. The percentile rank is 18.

140.    The findings are that the Communication score is significantly lower than the Socialization score and that the Daily Living Skills score is significantly lower than the Socialization score.

141.    Based upon the feedback of General Education Teacher Mrs. Odifa, K.M. ABC standard score is 79, with a 90% confidence interval of 75 to 83. Her percentile rank of 8 means that her score was greater than or equal to 9% of individuals in K.M.'s age group in the Comprehensive Teacher Form normative sample.

142.    The Communication domain measures how well K.M. exchanges information with others. Based upon the feedback of General Education Teacher Mrs. Odifa, K.M.'s Communication standard score is 72, with a 90% confidence interval of 67 to 77. This corresponds to a percentile rank of 3.

143.     Based upon the feedback of General Education Teacher Mrs. Odifa, K.M.'s standard score for Daily Living Skills is 82, with a 90% confidence interval of 75 to 89 and a percentile rank of 12.

144.     Based upon the feedback of General Education Teacher Mrs. Odifa, K.M.'s Socialization standard score is 90, with a 90% confidence interval of 86 to 94. The percentile rank is 25.

*Adaptive Assessment Recommendations*:

145.     Based on K.M.'s current assessments, reported history, session/classroom observations, and teacher's reports, she demonstrates symptoms consistent with the Diagnostic and Statistical Manual of Mental Disorders – Fifth Edition (DSM-5) diagnosis of Intellectual Disability. – This is a recommended change from the Comprehensive Psychological Evaluation, (May 2019), based on new data that includes adaptive results.

146.     Based upon the May 2019 psychoeducational evaluation, the results of her April 2021 Adaptive Assessment, along with other sources of relevant information, MDT should consider this information in determining K.M.'s eligibility for Special Education services under the classification of Intellectual Disability.

147.     Due to her suicidal ideations and harm to self and others, it is recommended for K.M. to engage in therapeutic services. Individual therapy is recommended outside due to depression diagnosis on the May 2019 psychological evaluation.

148.     It is recommended that as part of engagement in therapeutic services that K.M. participate in a consultation and psychiatric evaluation to determine if a medical regimen would be appropriate for K.M.. However, a psychiatric follow-up would best determine if other interventions are warranted or would be an effective route for K.M.

149.     Parent incorporating daily living skills such as riding the subway, cooking, washing clothes, counting money/change, and money management. It is recommended that K.M. increase

participation in extracurricular activities. This would provide opportunity for positive socialization, as well as increase self-concept, confidence and motivation.

150.    Provide supports that include social skills, self-esteem, coping, understanding triggers, self-advocacy, problem-solving in social situations including specific skill building in (a) identifying and defining the problem, (b) generating a variety of alternative solutions, (c) identifying the most likely outcomes of each alternative, and (d) selecting and implementing the appropriate solution. K.M. would benefit from understanding her cognitive weaknesses and strengths and exploring how her brain functions in order for her to gain understanding of her struggles, academically/socially.

151.    Further recommendations include :

 --Make certain that attention is fully gained before giving instructions.

--Organize assignments into short, structured units to increase on-task behavior.

--Provide alternative environments with fewer distractions for test taking.

--Extended time for testing (classroom, state, and Defendant testing).

--Modification of test format and delivery (oral exams, use of a calculator, chunking or breaking down tests into smaller sections to complete, providing breaks between sections, quiet place to complete tests, multiple choice or fill in the blank test format instead of essay).

--Preferential seating.

--Shortened classroom and homework assignments that demonstrate understanding/mastery.

--Flexible testing scheduling.

--Testing in small groups.

--Reduce visual distractions.

152.    Upon information and belief, the adaptive assessment accommodations were not considered, recommended, and implemented by the IEP team during the 2020-21 school year.

153.     Upon information and belief, the aforementioned adaptive assessment recommendations for K.M. above have not been properly incorporated in K.M.'s IEP and implemented by Defendants during the 2020-21 school year.

154.     Upon information and belief, K.M. was not provided appropriate therapeutic services by Defendants during the 2019-20, 2020-21 and 2021-20 school years.

155.     Upon information and belief, K.M. was not provided a consultation and psychiatric evaluation by Defendants during the 2019-20, 2020-21 and 2021-20 school years.

156.     Upon information and belief, K.M. was not provided modification of testing format and delivery, extended time for testing, etc. by Defendant during the 2019-20, 2020-21 and 2021-20 school years.

### III.     Speech and Language Evaluation

157.     In March 2021, Defendants conducted a Speech -Language Evaluation of K.M.  She was administered the following tests: Clinical Evaluation of Language Fundamental -5, Peabody Picture Vocabulary Test-t, Expressive Vocabulary Test-3, Informal Articulation Evaluation, Informal Hearing Evaluation, Informal Voice Evaluation, and Informal Fluency Evaluation.

158.     The Clinical Evaluation of Language Fundamental -5 ("CELF-5") is an individually administered clinical tool for the identification, diagnosis, and follow-up evaluation of language and communication disorders in students 5-21 years. It is a measure of receptive and expressive language skills in the areas of morphology, semantics, syntax, and memory. A series of subtests are administered to determine composite Index Scores.

159.     The CELF-5 test administered to K.M. determined the following:

**SCORE SUMMARY**

**Test Scaled Scores**

| | Raw Score | Scaled Score | Confidence Interval | Percentile Rank | Percentile Rank CI | Age Equivalent | GSV | NCE | Stanine |
|---|---|---|---|---|---|---|---|---|---|

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Word Classes | 21 | 3 | 1 to 5 | 1 | 0.1 to 5 | 7:10 | 511 | 1 | 1 |
| Following Directions | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Formulated Sentences | 21 | 2 | 1 to 4 | 0.4 | 0.1 to 2 | 6:8 | 495 | <1 | 1 |
| Recalling Sentences | 39 | 5 | 4 to 6 | 5 | 2 to 9 | 7:10 | 509 | 15 | 2 |
| Understanding Spoken | 9 | 5 | 3 to 7 | 5 | 1 to 16 | N/A | N/A | 15 | 2 |
| Word Definitions | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Sentence Assembly | 2 | 3 | 2 to 4 | 1 | 0.4 to 2 | 5:11 | 379 | 1 | 1 |
| Semantic Relationships | 2 | 3 | 1 to 5 | 1 | 0.1 to 5 | 5:7 | 427 | 1 | 1 |
| Pragmatics Profile | --- | --- | --- | --- | --- | --- | --- | --- | --- |

**Core Language Score and Index Scores**

| | Standard Score | Confidence Interval | Percentile Rank | Percentile Rank CI |
|---|---|---|---|---|
| Core Language Score | 62 | 57 to 67 | 1 | 0.2 to 1 |
| Receptive Language Index | 63 | 58 to 68 | 1 | 0.3 to 2 |
| Expressive Language Index | 61 | 56 to 66 | 0.5 | 0.2 to 1 |
| Language Content Index | 61 | 56 to 66 | 0.5 | 0.2 to 1 |
| Language Memory Index | --- | --- | --- | --- |

160.    K.M.'s Core Language Score was derived from the CELF-5 Test. The Core

Language Score is a measure of general language ability and provides an easy and reliable

way to quantify K.M.'s overall language performance. The Core Language Score has a

mean of 100 and a standard deviation of 15. A score of 100 on this scale represents the

performance of the typical student of a given age.

161.    For K.M.'s Core Language Score, the following tests were administered:

Formulated Sentences

Recalling Sentences

Understanding Spoken Paragraphs

Semantic Relationships

162.        K.M. received a Core Language Score of 62 (confidence interval = 57 to 67, percentile rank = 1). This places K.M. in the very low to severe range of language functioning.

163.        For K.M.'s Receptive Language Index score, the following tests were administered:

Word Classes

Semantic Relationships

Understanding Spoken Paragraphs

164.        K.M. received a Receptive Language Index score of 63 (confidence interval = 58 to 68, percentile rank = 1). This places K.M. in the very low to severe range of language functioning.

165.        For K.M.'s Expressive Language Index score, the following tests were administered:

Formulated Sentences

Recalling Sentences

Sentence Assembly

166.        K.M. received an Expressive Language Index score of 61 (confidence interval = 56 to 66, percentile rank = 0.5). This places K.M. in the very low to severe range of language functioning.

167.        For K.M.'s Language Content Index score, the following tests were administered:

Word Classes

Understanding Spoken Paragraphs

Sentence Assembly

168.        K.M. received a Language Content Index score of 61 (confidence interval = 56 to 66, percentile rank = 0.5). This places K.M. in the very low to severe range of language functioning.

169.        The Word Classes test is used to evaluate the student's ability to understand relationships between words based on meaning features, function, or place or time of

occurrence. The student chooses the two words (i.e., pictures or presented orally) that best represent the desired relationship. This test has a mean of 10 and the standard deviation is 3.  K.M. received a scaled score of 3 (confidence interval = 1 to 5, percentile rank = 1) on the Word Classes test.

170.     The Formulated Sentences test is used to evaluate the ability to formulate simple, compound, and complex sentences when given grammatical (semantic and syntactic) constraints. K.M. received a scaled score of 2 (confidence interval = 1 to 4, percentile rank = 0.4) on the Formulated Sentences test.

171.     The Recalling Sentences test is used to evaluate the student's ability to recall and reproduce sentences of varying length and syntactic complexity.  K.M. received a scaled score of 5 (confidence interval = 4 to 6, percentile rank = 5) on the Recalling Sentences test.

172.     K.M. received a scaled score of 5 (confidence interval = 3 to 7, percentile rank = 5) on the Understanding Spoken Paragraphs test.

173.     The Sentence Assembly test is used to evaluate the student's ability to assemble syntactic structures. K.M. received a scaled score of 3 (confidence interval = 2 to 4, percentile rank = 1) on the Sentence Assembly test.

174.     The Semantic Relationships test is used to evaluate the student's ability to interpret sentences that (a) make comparisons, (b) identify locations or directions, (c) specify time relationships, (d) include serial order, or (e) are expressed in passive voice.  K.M. received a scaled score of 3 (confidence interval = 1 to 5, percentile rank = 1) on the Semantic Relationships test.

175.     The Peabody Picture Vocabulary Test, fifth edition (PPVTTM–5) is a measure of receptive vocabulary for individuals ages 2 years, 6 months–90 years and older. K.M. was administered the PPVT-5 Form A. The student has to match a visual representation with a spoken construct. This test has a mean of 100 with a standard deviation of 15. Scores between 85-115 are considered to

be within normal limits. K.M. achieved a Standard Score of 70, Confidence Interval of 95% is 66-77, and a Percentile Rank of 2.

176.     K.M.'s standard score of 70 on the PPVTTM-5 was well below the expected range relative to other individuals of the same age group.

177.     Informal hearing, fluency, and voice evaluations were also administered. K.M.'s fluency, hearing, and voice skills were judged to be essentially within normal limits of functioning for age and gender.

178.     EVT-3 was administered to assess vocabulary skills. The EVT-3 revealed K.M. achieved a Standard Score of 79, Confidence Interval of 95% is 75-85, and a Percentile Rank of 8. The standard score is below the expected range relative to other individuals of the same age group. Overall, the results of formal testing indicate deficits in receptive and expressive language skills.

179.     Upon information and belief, K.M. was not provided speech-language services in her IEP during the 2019-20 and only during the last quarter of the 2020-21 school year.

180.     Upon information and belief, K.M. was not provided speech-language services by Defendant during the 2019-20 and only during the last quarter of the 2020-21 school year.

**Failure to Appropriately Address Needs Prior to 2018-19 School Year**

181.     Upon information and belief, K.M. has had an Intellectual Disability, Emotional Disturbance, and learning difficulties prior to receiving her first IEP on May 20, 2019.

182.     Further, upon information and belief, K.M. was a student in FCPS during the 2016-17, 2017-18 and 2018-19 school years with an intellectual disability, serious emotional disabilities and learning disabilities.  Moreover, as is currently known, she has always had an intellectual disability but that was not identified until March 2021.

183.     Upon information and belief, K.M. was in need of specially designed instruction, related services, and accommodations during the 2016-17, 2017-18 and 2018-19 school years as a result of her intellectual disability, emotional disturbance, and learning disabilities.

184.      Upon information and belief, the Defendants were aware of her needs during the 2016-17,

2017-18, and 2018-19 school years but failed to evaluate and determine K.M.'s need for specially

designed instruction.

### GRADES (9th Grade for K.M.)

185.      During the 2020-21 SY, K.M. obtained poor grades at FPCS in the following subjects:

| 2020-21 Fall Semester-S1 Subjects | 2020-21 Spring Semester -S2 Grades |
|---|---|
| Algebra I | F |
| Biology | C |
| College & Career Prep | No grade provided |
| Literary Genres | F |
| Reading Lab | C |
| Theater | C |

| 2020-21 Term 2 Subjects | 2020-21 Term 2 Grades |
|---|---|
| Algebra I | F |
| College & Career Prep | B |
| Explore A/E | F |
| Literary Genres | F |
| Physical Education | F |
| World History I | C |
|  |  |

186.      In Algebra I,  K.M. had a difficult time understanding math concepts for her grade level.

187.      For Explore A/E, K.M. had a lot of missing assignments.

188.      In Literary Genres, K.M. missed excessive classes and assignments.

189.      In Physical Education, K.M. missed excessive classes and work assignments.

190.      In World History, K.M. would often withdraw and lack participation.

191.      Upon information and belief, despite K.M. missing excessive classes and assignments

during the 2020-21 SY, Defendant did not finalize a Functional Behavior Assessment to

determine why K.M. missed excessive classes and work assignments.

192.      During the 2020-21 SY, Defendant implemented no Behavioral Intervention Plan to

address K.M.'s excessive absenteeism, lack of completion of schoolwork assignments, or K.M.'s

withdrawal and lack of participation in class.

193.     K.M.'s 2019, 2020 and 2021 IEPs were not fully implemented by Defendant.

194.     K.M. made no meaningful progress on her IEP goals during the 2018-19, 2019-20, 2020-21 and 2021-22 school years.

195.     K.M. made no meaningful progress in her current placement with her current 2021 IEP.

### Inappropriate IEP PLAAFPS and IEP Goals

196.     K.M.'s 2019, 2020 and 2021 IEPs had defective present levels of academic achievement and functional performance ("PLAAFP's") and individualized education program ("IEP") goals.

197.     The 2019, 2020 and 2021 PLAAFP's are the same.

198.     The 2019 and 2020 IEP goals are the same.

199.     The 2021 IEP goals are not measurable, attainable or individualized for the unique needs of K.M.

200.     The 2019 and 2020 PLAAFP and IEP goals have not been met.

201.     The baseline data for the goals in the IEPs do not provide measurable baseline data regarding K.M.'s current level of functioning in areas of math, reading, written expression and cognitive ability.

202.     The 2019, 2020, and 2021 IEPs do not address all of K.M.'s needs as identified in her school-based evaluations, psychological evaluation and PLAAFPs.

203.     The 2019, 2020 and 2021 IEPs do not address regression from year to year.

204.     The 2019, 2020 and 2021 IEPs do not address her inability to receive special education and related services in a virtual environment.

205.     Because the 2019 and 2020 IEPs are identical, the Defendants failed to appropriately address all of K.M.'s needs when it developed her 2021 IEP.

206.     After noticing K.M.'s lack of progress, failing the 9th grade during the 2020-21 SY, exhibition of anxiety-based behaviors which contribute to school avoidance/refusal, Defendants

failed to provide evaluations of K.M. in all areas of suspected disabilities to appropriately

address of all her needs when developing her 2021 IEP.

207.    The mathematics Annual Goal 1 in the 2020 and 2021 IEPs state: By the end of the IEP

year, the student will solve multi digit arithmetic problems in numeric and word problem-based

instances with 80% accuracy.

208.    The baseline data provided for mathematics Annual Goal 1 is inappropriate. It does not

specify a measurable baseline regarding K.M.'s current level of functioning for solving multi

digit arithmetic problems.

209.    The mathematics Annual Goal 1 was not met by K.M.

210.    K.M. has not made progress on mathematics Annual Goal 1.

211.    The mathematics Annual Goal 1 was not individualized to the unique needs of  K.M.

during the 2018-19, 2019-20 and 2020-21 school years.

212.    The Math Annual Goal 2 in the 2020 & 2021 IEP states: By the end of the year, the

student will know that numbers that are not rational are called irrational and understand that

every number has a decimal expression and convert a decimal expansion which repeats

eventually into a rational number with 80% accuracy in 3 out of 4 instances.

213.    The Math Annual Goal 2 is confusing.

214.    The Math Annual Goal 2 does not specify a measurable baseline regarding K.M.'s

current level of functioning.  For instance, it does not address (1) whether K.M. knows difference

between rational and irrational numbers, (2) K.M.'s current level of understanding regarding

decimal expansion and (3) % of decimal expansion she's able to convert into a rational number

in ¾ instances.

215.    Upon information and belief, no attempt has been made to determine K.M.'s progress on

Math Annual Goal 2.

216.    K.M. did not make any progress on the Math Annual Goal 2 by the end of the 2019 SY or

2020 SY.

217.        K.M. did not achieve Math Annual Goal 2 by the end of the 2019 SY or 2020 SY.

218.        Given K.M.'s low level of mathematical ability the Math Annual Goal 2 is not attainable

and has not been individualized to meet K.M.'s unique needs.

219.        The reading Annual Goal 1 in the 2020 and 2021 IEPs states: By the end of the IEP year,

the student will read 125 words per minute with no more than 4 errors in a five-minute sample.

220.        The baseline data provided for reading Annual Goal 1 is inappropriate. It does not specify

a measurable baseline regarding K.M.'s current level of functioning for reading. For instance, it

does not inform about how many words per minute K.M. currently reads. Moreover, it doesn't

inform about her current no. of errors made in a five-minute sample.

221.        The reading Annual Goal 1 was not met by K.M.

222.        K.M. has not made progress on the reading Annual Goal 1.

223.        The reading Annual Goal 1 was not individualized to the unique needs of  K.M. during

the 2018-19, 2019-20 and 2020-21 school years.

224.        The reading Annual Goal 2 states: by the end of the IEP year, the student will derive

central idea using textual evidence with 70% accuracy in 3 out 4 instances.

225.        The baseline data provided for reading Annual Goal 2 is inappropriate. It does not specify

a measurable baseline regarding what % accuracy and in what no. of instances K.M. is able to

derive the central idea using textual evidence when reading.

226.        The reading Annual Goal 2 was not met by K.M.

227.        K.M. is not making progress on this reading Annual Goal 2.

228.        The reading Annual Goal 2 was not individualized to the unique needs of  K.M. during

the 2018-19, 2019-20 and 2020-21 school years.

229.        The written expression Annual Goal 1 states: By the end of the IEP year, the student will

compose essays containing 5 paragraphs using appropriate English language conventions with

70% accuracy in 4 out of 5 instances.

230.     The baseline data provided for reading Annual Goal 1 is inappropriate. It does not specify a measurable baseline regarding the number of essays K.M. can compose containing 5 paragraphs. Moreover, it does not specify with what % accuracy and what amount out of 5 instances.

231.     This written expression Annual Goal 1  was not met by K.M.

232.     K.M. is not making progress on this written expression IEP goal.

233.     The written expressional Annual Goal 1 was not individualized to the unique needs of K.M. during the 2018-19, 2019-20 and 2020-21 school years.

234.     The cognitive Annual Goal 1 states: By the end  of the IEP year, the student will learn techniques for the promotion of self-awareness and emotional intelligence by "reading" own emotions and distinguish health from unhealth feelings.

235.     This cognitive Annual IEP Goal 2 does not appear to be a measurable goal for K.M to determine if progress has been made.

236.     The cognitive Annual Goal 2 states: By the end of the IEP year, the student will learn techniques of prevention of future episodes of emotional distress and development of personal growth by helping clients change core beliefs that are often at the heart of their suffering with 70% accuracy.

237.     The cognitive Annual Goal 2 is unclearly written and is not informed by sufficient baseline data to determine if meeting the cognitive IEP goal at a 70% rate is measurable or attainable.

238.     Upon information and belief, Defendant did not provide K.M. with appropriate academic support and adequate services during the 2018-19, 2019-20, 2020-21, 2021-22 School Years, consequently K.M did not meet her 2019, 2020 or 2021 IEP goals.

**Inappropriate IEP PLAAFPS and Goals for**

**April 9, 2021 Amended IEP**

239.     K.M.'s April 2021 Amended IEP Goals suffers from the same deficits as her previous

IEP's. K.M.'s April 20201 Amended IEP provides inappropriate PLAAFPS and IEP goals.

240.     Upon information and belief, Defendant did not furnish the Plaintiff's with an updated

IEP for the 2020-21 school year.

241.     The Amended April 2021 IEP states that despite gains made since K.M.'s last

assessment, she is still performing below grade level in math, reading and written expression, but

does not address regression in the stated goals and services.

242.     The mathematics Annual Goal 1 states: By the expiration, when given a word problem

that has one unknown value, K.M. will determine the value by creating and solving an equation

using a variable for the unknown value for (4 out of 5) word problems or 80% accuracy.

243.     The mathematics Annual Goal 1 is defective because it fails to provide when this goal is

supposed to be achieved by K.M.

244.     The mathematics Annual Goal 1 does not provide a measurable baseline regarding

K.M.'s current level of functioning. For instance, it does not address with what % accuracy or

the number of word problems out of 5-word problems, K.M. is currently able to solve an

equation using a variable for the unknown value.

245.     K.M. has not made progress on this mathematics IEP goal.

246.     K.M. did not achieve the mathematics Annual Goal 1 by the end of the 2020-21 School

Year.

247.     The mathematics Annual Goal 1 is not obtainable for K.M. given her low level of

mathematic progress and has not been individualized to meet her unique needs.

248.     The reading Annual Goal 1 states: By the expiration of this IEP, given a grade level

literary text with (15) teacher-selected, multisyllabic words reflecting (6) syllable types (e.g.

open, closed VCe, vowel teams, vowel teams-consonant, consonant-le, r-controlled), K.M. will

read the passage aloud and correctly decode each teacher-selected word by first dividing them

into syllables, with 80% accuracy (i.e. 12 out of 15 words) for (4 out of 5) adapted, grade-level texts.

249.     The reading Annual Goal 1 is not informed by sufficient baseline data.  At the time of preparation of this Amended April 2021 IEP, it is not discernible with what % accuracy K.M. is able to read a grade level literary text and decode each teacher selected word by dividing them into syllables.

250.     K.M. is not making progress on this reading IEP goal.

251.     K.M. did not achieve this IEP goal.

252.     K.M. is not reading on a 9th grade level and is not able to read passages aloud and correctly decode words by first dividing them into syllables.  Therefore, this reading Annual Goal 1 is not obtainable for K.M. and is not individualized to meet the unique needs of K.M.

253.     The written expression Annual Goal 1 states: By the expiration of this IEP, given an independent level text, a claim and counterclaim, K.M. will write an argument and cite (2) pieces of evidence (e.g. direct quotes, examples, reasons)  to support the given claim and respond to a counterclaim by citing (2) pieces of evidence, accurately choosing (3 out 4) pieces of evidence for (2 out of 3) texts or 75% accuracy.

254.     The written expression Annual goal 1 lacks baseline data to inform the % accuracy given an independent level text, a claim or counterclaim, K.M. is currently able to write an argument and cite (2) pieces of evidence to support the given claim and respond to counterclaims choosing 3 out of 4 pieces of evidence.

255.     K.M. did not achieve this Annual Goal 1 by the expiration of this IEP.

256.     Annual Goal 1 is not obtainable for K.M. and is not individualized to meet the unique needs of K.M.

257.     The Cognitive Annual Goal 1 states: By April 2022, after brainstorming and creating a personalized list of (2) areas for academic growth (e.g. homework completion, studying for tests, attending tutoring), K.M. will select one area of growth from the list and write (1) short-term

academic SMART goal that can be achieved within, with SP assistance (1.5) weeks and is

specific, measurable, attainable, realistic, and timed for (3 out of 3) assignments.

258.    The Cognitive Annual Goal 1 Annual Goal 1 is confusingly written and unclear.

259.    Cognitive Annual Goal 1 was not achieved by K.M. at the expiration of this April 2021

Amended IEP.

**Failure to Provide Transition Supports and Services and Defective Transitions Goals**

260.    During the 2019-20 and 2020-21 school years, K.M. was entitled to transition supports

and services.

261.    Upon information and belief, the transition goals and services in the April 15, 2020 and

April 26, 202, IEPs were not appropriate for K.M.

262.    K.M. did not make progress towards her post-secondary education and training goals

because her serious behavioral issues impact her progress along with her deficits in reading,

writing and math.

263.    Upon information and belief, the Defendants failed to provide K.M. with tools to select

or training on how to identify five colleges that offer her major.  Moreover, upon information

and belief, the Defendants failed to explain what a major was to K.M.  More importantly, this

particular goal is not achievable with the current specially designed instruction, services,

accommodations, and related services because K.M. is not making progress.  Similarly, K.M.

engages in significant school avoidance and is unable to proficiently utilize a computer making

this goal unattainable.

264.    Similar to the above issue, K.M. does not understand what a profession is and has not

identified five professions that an intellectually disabled person with emotional disturbance can

pursue in college.  K.M. has some significant deficits in reading, writing, and math that are not

being appropriately addressed making this goal unattainable.

265.        Upon information and belief, K.M. was entitled to one hour per month of career

counseling and independent living skills training but did not receive those services during the

2019-20 and 2020-21 school years.

266.        Upon information and belief, between April 15, 2020, through the end of the 2020-21

school year, the Defendants did not arrange for or schedule an opportunity for K.M. to attend

independent living skills training within the education and employment community.

267.        Upon information and belief, during the 2019-20 and 2020-21 SY's, K.M. did not receive

the transition supports and services outlined in her IEPs.

**Failure to Revise IEP After Noticing Academic Failure During the 2018-19, 2019-20 and 2020-21 School Years**

268.        Defendants failed to revise K.M.'s IEP during the 2018-19 SY after noticing her poor

academic performance during the 2018-19 SY.

269.        Defendants failed to revise K.M.'s IEP during the 2019-20 SY after noticing her poor

academic performance during the 2019-20 SY.

270.        Defendants failed to revise K.M.'s IEP during the 2020-21 SY after noticing her poor

academic performance during the 2020-21 SY.

271.        Defendants failed to individualize K.M.'s IEPs to meet her unique needs during the 2018-

19, 2019-20 and 2020-21 SY's.

**Documented Significant Regression**

272.        According to K.M.'s May 2019 IEP, April 2020 IEP, and Amended 2021 IEPs, her

Assessments did not show progress and demonstrated continued regression.

273.        However, Defendants did not alter K.M.'s special education and related services to

address her regression.

47

274.     K.M.'s 2019 IEP, 2020 IEP and 2021 Amended IEP identified that K.M. was functioning below grade level in math, reading and written expression, but Defendants have done nothing to allow K.M. to access a FAPE.

275.     However, ESY services were never offered to K.M. during the summer of 2019, 2020 or 2021.

276.     ESY services were never provided to K.M. during the summer of 2019, 2020 or 2021.

277.     K.M. grades regressed between 8th and 9th grades at FPCS.

278.     K.M. grades regressed between the first and second semesters of 9th grade at FPCS.

279.     As a result, K.M. has regressed significantly and did not meet her May 2019 IEP goals, April 2020 IEP goals or April 2021 Amended IEP goals.

### Failure to Implement IEP and Unilateral Change in Placement

280.     Upon information and belief, from March 2020 through June 2021, the Defendants did not consistently provide K.M. with special education and related services.

281.     K.M. was entitled to 30 hours per week of specialized instruction in her 2020 & 2021 IEPs for the period of March 2020 to June 2021.  However, the distance learning plan created by Defendant for virtual instruction during the 2020-21 school year only made available to K.M. 12 hours of specialized instruction in her least restrictive environment ("LRE").

282.     In the underlying administrative due process hearing, the evidence indicates that K.M. was not provided with 30 hours of specialized instruction in her LRE between March 2020 and June 2020.

283.     In the underlying administrative due process hearing, the evidence indicates that K.M. was not provided with 18 hours of specialized instruction per week according to her IEP from August 2020 to June 2021.

284.     K.M. was entitled to behavioral support services.  K.M. was not provided with 4 hours per month of behavioral support services March 2020 to June 2021.

285.     K.M. was entitled to a dedicated aide. However, K.M. was not provided a dedicated aide 8 hours per day, outside general education April 2021, May 2021, June 2021 or for any period during virtual instruction at FPCS.

286.     Upon information and belief, during the aforementioned period, Plaintiffs were not provided with an option to revise the IEP to address virtual learning.

287.     As a result, K.M. has regressed significantly and did not meet her May 2019, April 2020 or April 2021 Amended IEP goals.

### Failed to Provide Behavioral Supports During the 2019-20 and 2020-21 School Years

288.     Defendants failed to timely conduct a functional behavioral assessment, finalize a functional behavioral assessment, create an appropriate behavioral intervention plan and implement a behavioral intervention plan for K.M. after noticing the student's anxiety related behavioral concerns during the 2019-20 and 2020-21 school years.

289.     As a result, K.M. has regressed significant in her academic performance and has not met her May 2019 IEP goals, April 2020 IEP goals or April 2021 Amended IEP goals.

### The Defendants Failed to Provide Sufficient Related Services

290.     Defendants were aware of K.M.'s cognitive deficiencies during the 2018-19, 2019-20 and 2020-21 school years.

291.     K.M. has significant cognitive deficiencies that were not addressed during the 2018-19, 2019-20 and 2020-21 school years.

292.     Defendants were aware of K.M.'s cognitive deficiencies but did not offer to conduct an occupational therapy evaluation or provide occupational therapy services to K.M.

293.     Defendants were aware that K.M. could benefit from social skills instruction.  However, the Defendants did not offer or provide K.M. with social skills instruction.

294.     As a result, K.M. regressed significantly in her academic performance and has not met her May 2019 IEP goals, April 2020 IEP goals or April 2021 Amended IEP goals.

**The Defendants Failed to Provide Speech-Language Pathology Services**

295.     Defendants were aware of K.M.'s cognitive deficiencies during the 2018-19, 2019-20 and

2020-21 school years.

296.     K.M. was not provided speech-language pathology services by Defendants during the

2018-19, 2019-20 and during the last quarter of the 2020-21 school year.

297.     Upon information and belief, K.M. was entitled to receive 4 hours per month of speech-

language services and K.M. did not receive speech language services for April 2021, May 2021,

June 2021.

298.     As a result, K.M. has regressed significant in her academic performance and did not meet

her May 2019 IEP goals, April 2020 IEP goals or April 2021 IEP goals.

## Failure to Provide Accommodations

299.     During the 2019-20 and 2020-21 school years, the Defendants did not consistently

provide the accommodations, services, aides, and other tools outlined in her IEPs.

300.     For classroom accommodations, K.M. was entitled to read aloud accommodations, small

group testing, extend time and frequent breaks and did not consistently receive some

accommodations and other accommodations were not provided at all to K.M.

301.     For statewide or alternate assessment accommodations, K.M. was entitled to read aloud

accommodations, small group testing, extend time and frequent breaks and did not consistently

receive some accommodations and other accommodations were not provided at all to K.M.

302.     As a result, K.M. did not make sufficient progress during the 2019-20 and 2020-21

school years.

## Failure to Conduct Assistive Technology Evaluation

303.     During the 2019-20 and 2020-21 school years, K.M. was forced to learn in a virtual

environment.  K.M. struggled and engaged in significant school avoidance behaviors primarily

because of her inability to use technology.

304.     K.M. was not able to independently use a computer and keyboard without assistance.

305.       Plaintiff D.B. was at work during virtual instruction for the 2020-21 SY and was not

available in the home to help K.M. to login for or access virtual instruction by computer.

306.       K.M. was not able to navigate virtual rooms without assistance.

307.       K.M. struggled learning and using the technological tools required to access virtual

learning.

308.       K.M. was not provided a dedicated aide to help her to login, navigate or otherwise access

virtual learning during the 2019-20 and 2020-21 SY's.

309.       K.M. was not provided technical support to help her to login, navigate or otherwise

access virtual learning during the 2019-20 and 2020-21 SY's.

310.       With this information, Defendants did not conduct an assistive technology evaluation to

determine her assistive technology needs.

### The Defendants Failed to Provide Assistive Technology Services

311.       Defendants were aware of K.M.'s cognitive deficiencies during the 2018-19, 2019-20 and

2020-21 school years.

312.       K.M. was not provided therapeutic services by Defendants for the period of

April 2021, May 2021, June 2021.

313.       Upon information and belief, Defendants did not implement most of the

recommendations on behalf of K.M. in the April 2021 Adaptive Assessment of K.M.

314.       As a result, K.M. has regressed significant in her academic performance and has not met

her May 2019 IEP goals, April 2020 IEP goals or April 2021 IEP goals.

### The Defendants Failed to Provide K.M. with a Dedicated Aide

315.       K.M. was not provided with a dedicated aide by Defendants during the 2018-19, 2019-20

and 2020-21 school years.

316.       Pursuant to her April 2021 Amended IEP, K.M. was entitled to a dedicated aide.

317.       Upon information and belief, K.M. was not provided with a dedicated aide for April

2021, May 2021, June 2021.

318.    As a result, K.M. has regressed significant in her academic performance and has not met her May 2019 IEP goals, April 2020 IEP goals or April 2020 Amended IEP goals.

**The Defendants Failed to Address K.M.'s Anxiety Related Behavioral Concerns**

319.    K.M. sometimes suffers from meltdowns when she is overwhelmed and doesn't understand class lessons which causes a manifestation of school avoidance.

320.    Although K.M.'s IEP incorporated interventions such as frequent breaks, small group testing and extended time for testing, these interventions did not eliminate her meltdowns.

321.    Defendants have not adequately addressed K.M.'s significant anxiety related behavioral concerns during the 2018-19, 2019-20, 2020-21, 2021-22 SY's.

322.    As a result of Defendants' failure to address K.M.'s anxiety related behavioral concerns, K.M. has regressed significantly, continues to perform academically below grade level and has not met any of her IEP goals.

**The Defendants Failed to Conduct Evaluations of K.M. In All Areas of Suspected Disability After Noticing the Student's Poor Academic Progress During the 2018-19,    2019-20, 2020-21 and 2021-22 School Years**

323.    According to the IDEA, children should be assessed in all areas of suspected disability and assessments shall provide relevant information to determine the child's educational needs. 20 U.S.C. § 1414(b)(3).

324.    Defendants failed to evaluate and assess K.M. in all areas of suspected disabilities to obtain relevant information to determine her educational needs after noticing KM.'s continued poor academic progress during the 2018-19, 2019-20, 2020-21 and 2021-22 SY's.

325.    During the 2018-19, 2019-20, 2020-21 and 2021-22 SY's, K.M. performed academically below her grade level for each school year.

326.    During the 2018-19, 2019-20, 2020-21 and 2021-22 SY's, K.M failed to meet her IEP goals.

327.     During the 2018-19, 2019-20, 2020-21 and 2021-22 SY's, Defendants did not evaluate

K.M. to determine why she performed academically below grade level for 3+ consecutive

school years and to determine if she needed additional supports and related services to access a

FAPE.

328.     As a result of Defendants' failure to evaluate, K.M. has regressed significantly,

continues to perform academically below grade level and has not met any of her IEP goals.

**Defendants Failed to Modify Classroom Accommodations  and Statewide or Alternate
Assessment Participation**

329.     During the 2018-19, 2019-20, 2020-21 school years, K.M. performed academically

below her grade level for each school year.

330.     During the 2018-19, 2019-20, 2020-21 school years, K.M also failed to meet her IEP

goals.

331.     During the 2018-19, 2019-20 and 2020-21 school years, K.M. performed poorly on

Statewide or Alternate Assessments.

332.     However, despite her poor academic performances above, K.M. was provided the exact

same classroom accommodations and statewide or alternate assessment accommodations in her

May 2019 IEP, April 2020 IEP and April 2021 Amended IEP.

333.     As a result of Defendants' failure to modify her accommodations, K.M. has regressed

significantly, continues to perform academically below grade level and has not met any of her

IEP goals.

**The Defendants Failed to Classify Student Appropriately Under the Proper IEP Disability
Category as Intellectually Disabled on her 2019 and 2020 IEPs**

334.     According to the IDEA, children should be assessed in all areas of suspected disability

and assessments shall provide relevant information to determine the child's educational needs.

20 U.S.C. § 1414(b)(3).

335.     Here, K.M. is clearly suspected of being a child with an intellectual disability.  However, K.M. was not assessed in all areas of suspected disability by Defendant during the 2018-19, 2019-20 and 2020-21 school years.  Even though K.M. performed below grade level in her coursework during each of the above school years, performed poorly on statewide testing, obtained low grades, exhibited anxiety about school and did not participate actively in class, Defendants did not recommend that she be assessed in all areas of suspected disability to determine K.M.'s educational needs.

336.     In addition, although K.M. obtained a 2019 Psychological Evaluation that classified K.M. with a low 69 IQ, the IEP team did not consider this 2019 Psychological evaluation and re-classify K.M. under the more appropriate Intellectual Disability Classification on her 5/20/2019 and 4/15/2020 IEPs.

### The Defendants Failed to Provide/Generate a Safety Plan for Student During the 2018-19, 2019-20 School Years

337.     The May 14, 2019 Psychological Evaluation of K.M. recommended that Defendants generate a Safety Plan for student.

338.     The May 14, 2019 Psychological Evaluation determined that since K.M. had expressed suicidal ideation previously, K.M. would benefit from a school generated safety plan for K.M., which includes "safe" people she can talk to in school and strategies she can utilize to alleviate stress.

339.     Upon information and belief, Defendants failed to generate a safety plan for K.M. during the 2018-19 and 2019-20 School Years.

340.     Upon information and belief, Defendants generated an inadequate November 24, 2020, Safety Plan for K.M.  It failed to include "safe" people K.M. could talk to in school and robust strategies she could use to alleviate stress.  While it included actions for parent to take with K.M. it contained no actions for Defendants to help parent with in assisting K.M. For instance,

there was no designated person at school to help student if she was in crisis or to help parent to

help student when she was in a crisis.  Moreover, there is no description in the November 24,

2020 Safety Plan of specific trigger's for K.M. and how to de-escalate a crisis situation when

she was in a crisis.

341.     The November 24, 2020 Safety Plan was not incorporated as part of a behavioral

intervention plan for K.M.

342.     Upon information and belief, Defendants did not follow the November 24, 2020 Safety

Plan for K.M. for the 2020-21 SY or 2021-22 SY.

### The Defendants Failed to Provide an Occupational Therapy Evaluation of Student During the 2019-20, 2020-21 School Years

343.     According to the IDEA, the school shall use a variety of assessment tools and strategies

to gather relevant functional, developmental, and academic information about the child.

Information from evaluations will be used to determine the content of the child's IEP and to

help the child make progress in the general education curriculum. 20 U.S.C. § 1414(b)(2)(A).

344.     According to the IDEA, children should be assessed in all areas of suspected disability

and assessments shall provide relevant information to determine the child's educational needs.

20 U.S.C. § 1414(b)(3).

345.     Here, K.M. was not assessed in all areas of suspected disability by Defendants during the

2018-19, 2019-20 and 2020-21 school years.  K.M. was not assessed for Occupational Therapy

needs during this period of time.

346.     On February 25, 2021, Plaintiff D.B. requested by email to FCPS an occupational

therapy with a focus on sensory evaluation for K.M.

347.     On March 8, 2021, Defendants denied K.M.'s request for an occupational therapy

evaluation for K.M. without providing a cogent and responsive explanation as to why she was

denied the evaluation.

**The Defendants Failed to Provide a Complete and Final Functional Behavior Assessment for K.M. During the 2019-20, 2020-21 School Years**

348.     Defendants did not conduct, complete, and finalize a Functional Behavioral Assessment ("FBA") to determine if K.M.'s anxiety related behaviors caused her school avoidance behaviors prior to March 2021.  The Defendants did not conduct and finalize an FBA to determine why K.M. did not seem motivated in the virtual classroom, fails to complete her assignments, fails to self-advocate, and performs well below grade level prior to March 2021.

349.     Defendants did not conduct, complete, and finalize an FBA to determine why K.M. gets easily overwhelmed by school, fails to attend tutoring and classes sometimes, performs poorly in math, reading and writing.

350.     Defendants did not conduct, complete, and finalize an FBA to determine why K.M. previously expressed suicidal ideation.

351.     Moreover, on February 25, 2021, Plaintiff D.B. requested by email to Defendant an FBA for K.M.

**The Defendants Failed to Provide an Appropriate Behavioral Intervention Plan for K.M. During the 2019-20, 2020-21 and 2020-22 School Years**

352.     The Defendants created a behavior intervention plan based on the draft, non-finalized FBA but did not provide it to the required school personnel to implement.  The Defendants failed to provide Plaintiff D.B. a copy of the behavioral intervention plan created after preparing the draft FBA.

353.     Defendants failed to fully implement a behavioral intervention plan ("BIP") for K.M. to address her previously expressed suicidal ideation, lack of self-advocacy, anxiety and overwhelmed feelings about school, school refusal and poor academic performance in math, reading and writing.

**The Defendants Failed to Provide Extended School Year ("ESY") Services to K.M. During Summers of 2019, 2020 and 2021.**

354.    K.M.  regressed during the 2018-19, 2019-20, and 2020-21 school years.

355.    K.M. was not provided speech therapy services, a dedicated aide, therapeutic services, and other appropriate accommodations and supports during the period of 2019-20 to 2020-21 SY.

356.    Defendants' inability to provide appropriate special education and related services to K.M for the period of 2019-20 to 2020-21 SY jeopardized K.M.'s critical speech, math, reading, writing-expression skills.

357.    Defendants' inability to provide appropriate special education and related services to K.M for the period of 2019-20 to 2020-21 SY contributed to K.M.'s regressive academic performance.

358.    Upon information and belief, at the end of the 2019-2020, 2020-21 school years, the Defendants intentionally failed to inform Plaintiff D.B. of K.M.'s right to receive ESY services or other forms of remediation during the 2019, 2020, 2021 summers.

359.    The Office of the State Superintendent specifically identified three separate ways to determine ESY services, but the Defendants failed to consider any of the three areas.

360.    The Defendants did not analyze the three areas after recognizing K.M. was not making academic progress during the 2019-20 and 2020-21 SY's.

361.    K.M.'s math skills, reading skills, speech and language skills regressed and she academically underperformed and failed to meet her IEP mathematics, reading, written expression, speech and cognitive goals during the 2019-20 school year and 2020-21 school years.  K.M.'s grades dropped significantly during the 2019-20 and 2020-21 school years. K.M. also was not provided with ESY services during the 2019 summer, 2020 summer and 2021 summer.


**K.M. Was Denied a FAPE During 2019-20 and 2020-21 School Years**


362.    K.M. received some virtual instruction during the 2019-20 and 2020-21 school years.

363.     Upon information and belief, the Defendants did not conduct an IEP meeting to determine whether virtual instruction was appropriate for K.M.

364.     K.M. had a very difficult time with the provided virtual instruction.

365.     K.M. missed classes during the school week.

366.     K.M. did not log in online in the afternoons of certain days of the week.

367.     K.M. got easily overwhelmed with her class work.

368.     K.M. failed to self-advocate when additional time was needed to complete her assignments.

369.     In the virtual classroom, K.M. did not seem motivated and did not consistently complete her assignments.

370.     K.M. was unable to attend classes long enough to benefit from the virtual instruction and the Defendants were aware of this but did not offer to hold an IEP meeting to discuss how to individualize K.M.'s instruction.

371.     Plaintiff D.B. was not in the home during virtual instruction to help K.M. to attend virtual classes.  Plaintiff D.B. was typically at work during virtual instruction.

372.     Defendants did not offer K.M. one-on-one instruction in the home or offer to send her to a private school to receive in-person instruction.

373.     Defendants did not offer to pay for K.M. to receive related services in-person.

374.     Defendants did not recognize that K.M.'s cognitive issues limited her ability to receive virtual instruction without a certified adult assistant in the home.

375.     Defendants did not recognize that K.M.'s poor reading and reading comprehension limited her ability to receive virtual instruction without assistance.

## Defendants Denied Parent the Opportunity to Meaningfully Participate During the 2019-20 and 2020-21 School Years

376.     During the 2019-20 and 2020-21 school years, Defendants denied Plaintiff D.B. the right to meaningfully participate in K.M.'s education and failed to offer or provide Parent information and training to help her understand the student's rights to special education and related services during the 2019-20 and 2020-21 school years.

377.     Plaintiff D.B. was not informed that K.M had a right to receive new evaluations since K.M. failed to meet her IEP goals during the 2019-20 and 2020-21 school years to address her significant academic concerns.

378.     Plaintiff D.B. was not informed that she had a right to request independent educational evaluations if she disagreed with evaluations of K.M. already completed by Defendants.

379.     Plaintiff D.B. was never informed she had a right to a functional behavior assessment and behavioral intervention plan to address K.M.'s significant anxiety related behavioral concerns.

380.     Plaintiff D.B. was never informed that K.M.'s IEPs were defective and impeding her ability to advocate for K.M.

## Defendants Failed to Timely Provide Speech Therapy Services

381.     K.M. displayed significant need for speech-language therapy prior to the 2020-21 school year.

382.     K.M.'s March 2019 psychoeducational evaluation illustrated several areas of need related to her communication deficits but she was not evaluated for speech-language services until after Plaintiff D.B. made a specific request in 2021.

383.     Despite knowing K.M. needed speech language therapy, the Defendants failed to timely conduct a speech-language evaluation and provide speech language services to K.M. during the period of May 2019 through March 2021.

## Defendants Failed to Address School Avoidance Behaviors

384.     During the 2020-21 school year, K.M. engaged in significant school avoidance and school refusal behaviors but the Defendants failed to take any action to address her behavior until 2021.

385.     The Defendants noted that her school avoidance and attendance issues impacted her ability to make progress in reading, math, and other academic areas.

386.     Defendants did not conduct, complete, and finalize a functional behavior assessment and prepare an appropriate behavioral intervention plan to address K.M.'s behaviors, specifically her behaviors related to school avoidance until late in the 2020-21 school year.

## Defendants Failed to Provide Behavioral Support Services for K.M.

387.     Defendants failed to provide behavioral support services consistently to K.M. in her classroom and in a virtual setting through Zoom during the 2019-20 and 2020-21 school years.

388.     Moreover, after receiving additional information that K.M. would benefit from additional behavior supports, the Defendants did not increase her behavioral supports.

## The Defendants Failed to Provide Plaintiff D.B. with Progress Reports During the 2019-20 and 2020-21 School Years

389.     During the 2019-20 and 2020-21 school years, the Defendants failed to provide the parent with IEP progress reports during the 2019-20 and 2020-21 school years.

390.    The Defendants failure to provide the Plaintiffs with progress reports impeded Plaintiffs' ability to be informed and understand their rights to special education and related services.

## The Defendants Failed to Provide the Parent with Appropriate Related Services During the 2019-20 and 2020-21 School Years

391.    The Defendants were aware that Plaintiff D.B. needed parent training to allow her to assist K.M. access a FAPE because of her own struggles and to make appropriate progress on her IEP goals.

392.    As a parent with her own struggles, the Defendants failed to provide Plaintiff D.B. with parent training and appropriate related services to allow her to assist K.M. to access a FAPE during the 2019-20 and 2020-21 school years.

## Defendants Failed to Provide Student Records

393.    On or about March 9, 2021, Plaintiff D.B. requested K.M.'s cumulate file and educational records.

394.    Defendants did not provide Plaintiff D.B. with K.M.'s cumulative file and educational records during the 2020-21 SY or anytime thereafter.

395.    The Defendants failure to provide the Plaintiffs with progress reports impeded Plaintiffs' ability to be informed and understand their rights to special education and related services.

396.    Defendants' failure to provide K.M.'s cumulative file and educational records to Plaintiff D.B. denied her the ability to meaningfully participate in her child's education by accessing student performance.  It also prevented her from sharing relevant student records with providers and consulting with providers to seek advice and determine best options to help the student access a FAPE.

**Extended School Year Services**

397.    According to the OSSE Nonregulatory Guidance on Extended School Year Services, an

LEA must consider eligibility for ESY services once a year as part of the IEP process.[1] However,

OSSE states that "[an] IEP Team may need to reconvene to consider a student's ESY eligibility if

there is not enough data to make a determination at the time of the annual IEP review."[2]  Further,

an LEA should hold an IEP meeting to determine ESY between the months of December and

April.[3] Moreover, OSSE states that [d]ecisions for ESY services taking place after school, on

weekends, and/or during shorter breaks throughout the year should be made in a timely manner

following any relevant needs identified by the LEA or members of the student's IEP Team."[4]

OSSE further states that ESY decisions, should "consider at least three months of progress

monitoring data."[5]

398.    Defendants found K.M. ineligible for ESY services in her 2019, 2020 and 2021 IEPs,

without relying on data.

399.    The IEP Team did not reconvene each year to consider K.M.'s eligibility for ESY services

with the use of data to make a determination about her need for ESY services at the time of the

annual IEP meetings.

400.    In the underlying due process hearing, Defendants provided no evidence of what data was

relied upon by the IEP team when they decided K.M.'s ESY needs.

401.    Defendants provided no evidence in the underlying due process hearing that they

considered at least three months of progress monitoring data when making ESY decisions related

to K.M.

---

[1] https://osse.dc.gov/sites/default/files/dc/sites/osse/publication/attachments/ESY%20Certification%20Frequently%20Asked%20Questions_Guidance_v.2.2012_0.pdf 2¶ 1.

[2] *Id.* at 2 ¶ 1.

[3] *Id.* at 2 ¶ 2.

[4] *Id.*

[5] *Id.*

402.     Defendants held IEP meetings in 2019, 2020 and 2021. The records do not indicate a basis for denying K.M. ESY services.  The records are devoid of any information besides the decision to deny ESY services and the date of the IEP meetings.

403.     Defendants did not provide Plaintiff D.B. with a prior written notice for any of the IEP meetings describing the reasoning for denying K.M. ESY services.

404.     During the 2019-20 school year, K.M. made little to no progress on her IEP goals.

405.     During the 2020-21 school year, K.M. made no progress on her IEP goals.

406.     From 8th to 9th grade, K.M. academic scores dropped significantly.

407.     For the period of August 2020 to June 2021, K.M. academic scores dropped significantly.

408.     Defendants did not reconvene an IEP meeting between 8th and 9th grades to consider K.M.'s need for ESY services.

409.     Defendants did not consider K.M.'s significant regression between 8th and 9th grades to consider K.M.'s need for ESY services.

410.     Defendants did not consider K.M.'s significant regression between August 2020 to June 2021 to consider K.M.'s need for ESY services.

411.     Because Defendants failed to reconvene an IEP meeting between 8th and 9th grades or between August 2020 to June 2021 to address K.M.'s significant regression and need for ESY services, they failed to follow the procedural requirements of analyzing data, collecting progress monitoring data, and determining the time required for recoupment of critical skills for K.M.

412.     Because K.M. did not receive ESY services or the critical skills of reading, writing, math, behavioral and social during the summers of 2019, 2020 or 2021, she significantly regressed academically, behaviorally, and socially during the 2020-21 and 2021-20, school years.

**Due Process Hearing**

413.    As noted above, there were only two issues identified in the Plaintiffs' Due Process Complaint.

414.    The H.O. held a prehearing conference and determined that there were thirty-two (32) issues.  Plaintiffs protested and the H.O. revised the prehearing order to reflect three issues.

415.    Prior to the due process hearing, the Defendants failed to provide the Plaintiffs with the requested cumulative student educational records.

416.    The Defendants actually represented to the H.O. and Plaintiffs that they had provided all of K.M.'s educational records.

417.    The H.O. required the parties to provide all exhibits and evaluations five days prior to the due process hearing.

418.    The Defendants defied the H.O.'s Order and submitted many new and unknown student records after the five-day disclosure deadline and a few days prior to the start of the due process hearing, prejudicing the Plaintiffs.

419.    As a result, the H.O. continued the hearing.

420.    Taking full advantage of the continuance, the Defendants filed a ten-day letter.  But for the Defendants wrongful behavior, they would not have been able to submit the ten-day letter.  In essence, the Defendants took action to force a continuance to justify filing a ten-day letter.

421.    Prior to the hearing, the Plaintiffs submitted two separate expert reports reflecting the need of compensatory service hours in excess of 1000 hours.

422.    Plaintiffs presented both expert reports and both experts testified credibly about the reason for the hours and need for the hours.

423.    During the due process hearing, the reading expert testified credibly that K.M. was so far behind academically and well below grade level in reading, reading comprehension and writing that she would need compensatory services over several years to catch up academically.

424.     During the due process hearing, the evidence demonstrated that K.M. was entitled to 30 hours of special education services outside of the general education curriculum but was only provided twelve hours, at most.

425.     During the due process hearing, the evidence demonstrated that K.M. had reading deficits that were not addressed in the 2019 and 2020 IEPs.

426.     During the due process hearing, the evidence demonstrated that K.M. had math deficits that were not addressed in the 2019 and 2020 IEPs.

427.     During the due process hearing, the evidence demonstrated that K.M. had social-emotional deficits that were not addressed in the 2019 and 2020 IEPs.

428.     During the due process hearing, the evidence demonstrated that K.M. had behavioral deficits that were not appropriately addressed in the 2019 and 2020 IEPs.

429.     During the due process hearing, the evidence demonstrated that K.M. was in need of a functional behavior assessment prior to March 2021 but was not provided a functional behavioral assessment until March 2021.

430.     During the due process hearing, the evidence demonstrated that K.M. was in need of a BIP prior to March 2021 but was not provided a BIP until March 2021.

431.     During the due process hearing, the evidence demonstrated that the Defendants did not conduct updated evaluations until the Plaintiffs requested evaluations despite K.M. regressing during the period of March 2020 through June 2021.

432.     During the due process hearing, the evidence demonstrated that K.M. qualified and was in need of ESY services during the 2020 and 2021 summers but was denied without being provided an appropriate reason for the denial.

433.     During the due process hearing, the evidence demonstrated that although Defendants knew that K.M. struggled with reading and writing, Defendants did not provide her with text to speech or speech to text services during virtual instruction.

65

434.     During the due process hearing, the evidence demonstrated that K.M. was not provided with an opportunity to participate in an in person learning Hub at FPCS during the 2020-21 SY, nor was this educational opportunity addressed as an accommodation in her April 2021 IEPs.

435.     During the due process hearing, the evidence demonstrated that K.M. did not receive the appropriate behavioral supports needed to be able to profit and access her general education and special education services.

436.     During the due process hearing, the evidence demonstrated that K.M. never received an assistive technology evaluation or appropriate training on how to use and navigate the virtual learning environment.

437.     During the due process hearing, the evidence demonstrated that K.M. was reading several grades below her grade level prior to and during the period of March 2020 through June 2021.

438.     During the due process hearing, the evidence demonstrated that K.M. was performing well below her grade level in math.

439.     During the due process hearing, the evidence demonstrated that the Defendants did not offer to provide a one-on-one aide in the home or virtually during the period of March 2020 through March 2021 despite K.M.'s inability to read and navigate the virtual learning environment.

440.     During the due process hearing, the evidence demonstrated that Defendants did not provide a virtual tech support aide to help K.M. access and navigate the virtual learning environment.

441.     During the due process hearing, the Defendants' speech-language expert testified that she had not seen the one-on-one aide despite holding the speech language sessions with K.M. during the school day or had known that K.M. had a one-on-one aide for eight hours per day.

442.     During the due process hearing, Plaintiffs presented a speech-language expert that testified that K.M. had significant speech language needs prior to March 2021 and would need compensatory services hours to address the Defendants failure to provide speech-language services to K.M.

443.     During the due process hearing, Plaintiffs presented a reading expert who testified that K.M.'s reading needs were not appropriately addressed in the 2019 and 2020 IEPs.  The reading expert also testified that K.M.'s reading needs were not addressed and that her reading deficits were skills that should have been addressed as early as her kindergarten year.

444.     During the due process hearing, the evidence demonstrated that K.M.'s IEP was not fully implemented during the period of March 2020 through June 2021.

445.     During the due process hearing, the evidence demonstrated that the 2019, 2020, and 2021 IEPs did not appropriately address K.M.'s needs.

446.     During the due process hearing, the evidence demonstrated that K.M. did not receive the services of her one-on-one aide.

447.     During the due process hearing, the evidence demonstrated that K.M.'s school avoidance behaviors were not directly addressed by the Defendants and impacted her ability to receive her academic services, accommodations, and related services.

448.     During the due process hearing, the evidence demonstrated that the 2019 and 2020 IEPs did not provide for speech-language services despite the need for speech-language services.

449.     During the due process hearing, the evidence demonstrated that the Defendants had ample evidence that K.M. had communication deficits and was in need of related services as early as the development of the May 2019 IEP.

450.     During the due process hearing, the evidence demonstrated that the Defendants did not provide transition services to K.M. as outlined in her IEP's.

451.     During the due process hearing the evidence demonstrated the Defendants did not provide K.M. with transportation for ESY services.

452.     During the due process hearing, the evidence demonstrated that the 2019 and 2020 IEPs practically remained the same.

453.    During the due process hearing, the evidence demonstrated that Defendants did not provide Ms. Bond parent training on how to use and navigate the virtual learning environment so she could help K.M. access her classes during the virtual learning environment.

454.    During the due process hearing the evidence demonstrated that hundreds of student records were not produced to Parent or her representative despite the parent's request and undersigned counsel's subsequent request for K.M. cumulative academic records which denied Ms. Bond's right to meaningfully participate in her child's education.

455.    During the due process hearing, the evidence demonstrated that Defendants failure to provide K.M. cumulative academic records to Parent or her representative impeded parent's ability to provide those records to providers for K.M. or to experts to help K.M. access a FAPE.

456.    During the due process hearing, the parties heard an ongoing discussion regarding non-case related matters in the background while presenting evidence during the hearing.

457.    During the due process hearing, the Defendants did not call any witnesses from K.M.'s current District of Columbia Public School to discuss how she is currently performing.

458.    During the due process hearing, the Defendants did not present any Defendants' witnesses who testified that they had observed K.M. in her current District of Columbia Public School.

## **Plaintiffs are Prevailing Parties in the Administrative Proceeding on One of the Three Issues Crafted by H.O. Coles Ruff.**

459.    Plaintiffs are "prevailing parties" in the administrative proceeding on one of the three issues before H.O. Ruff.

   a.  Defendants denied Student a FAPE by failing to develop appropriate an IEP during SY 2020-21.  More specifically, Defendants did not sustain the burden of persuasion by a preponderance of the evidence that Student's April 15, 2020 IEP was reasonably calculated to enable Student to make progress in light of the Student's circumstances.

460.     H.O. Ruff lacked subject matter jurisdiction on the remaining issues:

    a.   Whether Plaintiffs rights were denied by Defendants violation of section 504 of the Rehabilitation Act of 1973 and Title II of the ADA?

461.     As the prevailing party in the due process proceeding, the IDEA provides that Plaintiffs may seek reimbursement for their reasonable attorneys' fees (including costs), subject to the discretion of this district court.

462.     Despite the Plaintiffs providing sufficient evidence throughout the due process hearing that special education and related services described below were not provided to K.M.,  the H.O. did not provide compensatory education services in the H.O. decision to make up for Defendants failure to provide special education and related services in the following areas:

    a.   Failure to conduct a speech-language evaluation between May 2019 through march 2021;

    b.   Failure to provide for compensatory education services for failing to timely conduct a speech-language evaluation between May 2019 and March 2021;

    c.   Failure to provide compensatory education services for failure to provide direct speech-language service hours between May 2019 and March 2021;

    d.   Failure to provide compensatory service hours for the Defendants' failure to provide ESY during the 2019 summer;

    e.   Failure to revise the May 2019 IEP to reflect K.M.'s lack of progress over the period of May 2019 and April 2020;

    f.   Failure to provide compensatory services for the Defendants' failure to provide one-on-one aide during the period of August 2019 through March 2021;

    g.   Failure to provide reading IEP goals during the period of May 2019 through April 2020;

    h.   Failure to provide appropriate math IEP goals during the period of May 2019 through April 2020;

i.  Failure to provide appropriate behavioral supports during the period of May 2019 through June 2021;

j.  Failure to conduct a functional behavioral assessment during the period of May 2019 through March 2021;

k.  Failure to create and implement a BIP during the period of May 2019 through June 2021;

l.  Failure to provide the transition services identified in the IEP during the period of April 2020 through June 2021;

m.  Failure to implement the IEP during the period of March 2020 through June 2021;

n.  Failure to conduct an adaptive behavioral assessment during the period of May 2019 through March 2021;

o.  Failure to provide 30 hours of specially designed instruction during the period of August 2020 through June 2021;

p.  Failure to conduct an occupational therapy evaluation during the period of May 2019 through June 2021;

q.  Failure to conduct an occupational therapy evaluation after Plaintiff D.B. made a written request for an occupational therapy evaluation during the 2020-21 school year;

r.  Failure to provide Plaintiff D.B. with all of K.M.'s educational records after she made a written request during the 2020-21 school year;

s.  Failure to provide a copy of the behavior intervention plan to Plaintiff D.B. during the 2020-21 school year;

t.  Failure to ensure the one-on-one aide provided support to K.M. during the 2020-21 school year;

u.  Failure to conduct an assistive technology evaluation during the period of March 2020 through June 2021;

v.   Failure to provide parent training and counseling to Plaintiff D.B. after forcing K.M. to learn in a virtual, homebound environment;

w.   Failure to provide in-person support to K.M. during the period of August 2020 through June 2021;

x.   Failure to ensure Plaintiff D.B. knew and was apprised of any in-person learning opportunities during the 2020-21 school year while allowing other students to receive the in-person learning support;

y.   Failure to provide ESY during the 2020 and 2021 summers; and

z.   Failure to provide Plaintiff D.B. the opportunity to meaningfully participate during the 2020-21 school year.

aa.   The H.O. did not provide compensatory service hours to K.M. for the majority of the above-mentioned denials of a free, appropriate public education by Defendants, despite having overwhelming evidence demonstrating the need for compensatory service hours.

## CLAIMS FOR RELIEF

## COUNT I

(Appeal of H.O. Decision because 1) the H.O. Decision was partially wrong and not regularly made, 2) the Defendants did not sustain the burden of persuasion by a preponderance of the evidence that K.M.'s May 2019 and April 2021 IEPs were reasonably calculated to enable her to make progress in light of her circumstances, 3) Plaintiffs met their burden demonstrating the 2019-20 and 2020-21 IEPs were not materially implemented, 4) Plaintiffs met their burden of persuasion that Plaintiff D.B. was denied an opportunity to meaningfully participate, and 5) COVID-19 did not excuse Defendants from implementing K.M.'s IEP.

### 1)   The H.O. Decision Was Wrong and Not Regularly Made

463.   Plaintiffs incorporate all preceding paragraphs into this Count by reference as if fully stated herein.

464.   Plaintiffs are "prevailing parties" in the administrative proceedings on one of the three issues before H.O. Coles.

71

465.        "The party challenging the hearing officer's ruling must 'at least take on the burden of

persuading the court that the hearing officer was wrong,' and a court "upsetting the officer's

decision must at least explain its basis for doing so." *Kerkam v. McKenzie*, 862 F.2d 884, 887

(D.C.Cir.1989). … And a decision "without reasoned and specific findings deserves little

deference." *Kerkam v. Superintendent, D.C. Pub. Schs.*, 931 F.2d 84, 87 (D.C.Cir.1991) (internal

quotations omitted)." *Id.*"

466.        The process and proceedings were not regularly made in the underlying litigation and the

H.O. Decision was partially wrong when H.O. allowed Defendants to include their exhibits in the

hearing after Defendants misled the tribunal regarding their failure to disclose all documents to

Plaintiffs.  Defendants informed the tribunal they had disclosed to Plaintiffs all documents

previously requested by Plaintiffs, only to then supplement their exhibits with large amounts of

new documents immediately days prior to the hearing.  This was a lack of candor to the tribunal

and clearly prejudicial to Parent and Student.  H.O. failed to include these facts in his findings of

facts in the HOD. H.O. also failed to describe in his conclusions of law and legal analysis that

Defendants failure to provide student records to Parent, even when student records were

requested by Parent during the 2020-21 SY, which was a violation of the IDEA and did not allow

parent to meaningfully participate in her child's education during the 2020-21 SY.  Plaintiffs

were prejudiced by these actions of Defendants. The process was extremely prejudicial to the

Student and Parent, flawed and clearly erroneous, and the decision rendered should be

overturned by this Court.

467.        The process and proceedings were not regularly made in the underlying administrative

litigation and the H.O. Decision was partially wrong when H.O. failed to mention in his

conclusions of law and legal analysis that Defendants failure to provide student records to

undersigned counsel when student's cumulative records were requested by undersigned counsel

many months in advance of the due process hearing was a violation of the IDEA, did not allow

parent to meaningfully participate in her child's education and did not allow undersigned counsel to appropriately prepare for the underlying hearing.   Plaintiffs were prejudiced by these actions. Therefore, the process and proceedings were extremely prejudicial to the Student and Parent, flawed and clearly erroneous, and the decision rendered should be overturned by this Court.

468.        The process and proceedings were not regularly made in the underlying administrative litigation and the H.O. Decision was partially wrong when H.O. failed to include in his findings of facts, conclusions of law and legal analysis that Defendants misled H.O. on the record when they told H.O. that all student records had been produced to Plaintiffs and then turned around and incorporated large amounts of new documents in their disclosures immediately  days prior to the hearing, which denied parent the opportunity to meaningfully participate in her child's education and denied undersigned counsel the opportunity to adequately prepare for the hearing.  The Defendants did not provide a cogent and responsive explanation as to why it denied Plaintiff D.B. the opportunity to meaningfully participate.  Plaintiffs were prejudiced by these actions. Therefore, the process and proceedings were extremely prejudicial to the Student and Parent, flawed and clearly erroneous, and the decision rendered should be overturned by this Court.

469.        The process was not regularly made in the underlying administrative litigation and the H.O. Decision was partially wrong when H.O. failed to grant Plaintiffs subpoenas for records prior to the hearing.  Plaintiffs were prejudiced by these actions. Therefore, the process was extremely prejudicial to the Student and Parent, flawed and clearly erroneous, and the decision rendered should be overturned by this Court.

470.        The process was not regularly made in the underlying administrative litigation and the H.O. Decision was partially wrong when H.O. inaccurately interpreted the law and failed to follow binding legal authority in the same jurisdiction.  Plaintiffs were prejudiced by these actions. Therefore, the process was extremely prejudicial to the Student and Parent, flawed and clearly erroneous, and the decision rendered should be overturned by this Court.

471.     The process was not regularly made and the H.O. Decision was partially wrong in the underlying administrative litigation when H.O. failed to consider testimony of all expert witnesses when drafting a HOD.  Therefore, the process was extremely prejudicial to the Student and Parent, flawed and clearly erroneous, and the decision rendered should be overturned by this Court.

472.     The process was not regularly made in the underlying administrative litigation and the H.O. Decision was partially wrong when H.O. mischaracterized witness testimony.  Therefore, the process was extremely prejudicial to the Student and Parent, flawed and clearly erroneous, and the decision rendered should be overturned by this Court.

473.     The process was not regularly made in the underlying administrative litigation and the H.O. Decision was partially wrong when H.O. in two instances, unliterally modified issues for adjudication in Plaintiffs DPC without the consent of Plaintiffs.  Therefore, the process was extremely prejudicial to the Student and Parent, flawed and clearly erroneous, and the decision rendered should be overturned by this Court.

474.     The process was not regularly made in the underlying administrative litigation and the H.O. Decision was partially wrong and prejudicial to Plaintiffs when H.O. showed favoritism to Defendants before and during the due process hearing.  For instance, H.O. Ruff failed to appropriately sanction Defendants for misrepresentation of facts and demonstrating a lack of candor to tribunal by claiming to have disclosed all student records to Plaintiffs prior to the due process hearing, when they clearly failed to do so.  H.O. also failed to grant Plaintiffs request for issuance of subpoena for records on or about December 23, 2021.  Therefore, the process was extremely prejudicial to the Student and Parent, flawed and clearly erroneous, and the decision rendered should be overturned by this Court.

475.     The process was not regularly made in the underlying administrative litigation and the H.O. Decision was partially wrong when H.O. Ruff ordered the parties to submit a written closing against the wishes of Plaintiffs who requested to make an oral closing argument and then

H.O. failed to give it actual and meaningful consideration. This resulted in an unnecessary waste of resources and time.  Therefore, the process was extremely prejudicial to the Student and Parent, flawed and clearly erroneous, and the decision rendered should be overturned by this Court.

476.     The process was not regularly made in the underlying administrative litigation and the H.O. Decision was partially wrong when H.O. Ruff made inadequate findings of facts. Therefore, the process was extremely prejudicial to the Student and Parent, flawed and clearly erroneous, and the decision rendered should be overturned by this Court.

477.     The process was not regularly made in the underlying administrative litigation and the H.O. Decision was partially wrong when H.O. Ruff made inadequate conclusions of law. Therefore, the process was extremely prejudicial to the Student and Parent, flawed and clearly erroneous, and the decision rendered should be overturned by this Court.  Plaintiffs met their burden of persuasion by a preponderance of the evidence on the H.O. revised issues 2 and 3. The testimonial evidence (offered by fact and expert witnesses) and documentary evidence (e.g., expert reports, student records) provided in the underlying hearing support such a finding. However, based upon the analysis in the HOD it appears H.O. Ruff sought Plaintiffs to meet their burden on issues 2 and 3 by a standard outside of the preponderance of evidence and placed a much higher burden on Plaintiffs to prove issues 2 and 3 beyond a reasonable doubt. Moreover, the evidence indicates that Defendants did not sustain their burden of persuasion by a preponderance of the evidence on issue 1, that K.M.'s April 2021 IEP was reasonably calculated to enable K.M. to make progress appropriate in light of her circumstances.  First, K.M. had two IEPs in April 2021 (April 13, 2021 IEP and an Amended April 26, 2021).  H.O. bald statement that K.M.'s April 2021 IEP was reasonably calculated to enable K.M. to make progress appropriate in light of her circumstances does not even bother to specify and inform the reader as to which of the two April 2021 IEPs were purportedly reasonably calculated to enable K.M. to make progress appropriate in light of her circumstances.  Second, the evidence in the underlying

hearing clearly demonstrate that both of the April 2021 IEPs were inappropriate and denied K.M. a FAPE during the 2020-21 SY.  The evidence provided supports that the IEP goals and PLAAFPs described in both of the April 2021 IEPs were for a student performing in reading, written expression, and math on a 9th grade level.  Here, K.M. performed well below 9th grade level in reading, written expression and math and therefore could not and would not have met the April 2021 IEP goals.  Both of the April 2021 IEPs were not individualized to help her make progress in light of her unique circumstances.   Furthermore, K.M. was not provided appropriate supports and accommodations in the April 2021 IEPs such as a dedicated aide to help her to log onto Zoom, Microsoft teams and to navigate educational platforms to access virtual instruction. For a student who struggled with reading and writing, K.M. was not provided with text to speech or speech to text services during virtual instruction.  K.M. was not provided with an opportunity to participate in an in person learning Hub at FPCS during the 2020-21 SY, nor was this educational opportunity addressed as an accommodation in her April 2021 IEPs. Moreover, the recommendations in K.M.'s psycho-educational evaluation and other evaluations were not implemented to benefit K.M. or incorporated into her April 2021 IEPs. Finally, K.M.'s April 2021 IEPs failed to address K.M.'s poor attendance concerns, school avoidance and school refusal concerns, did not provide extended school year ("ESY") services or ESY transportation, and failed to address her poor grades and academic regression during 9th grade.  The Defendants failed to provide a cogent and responsive explanation as to why it did not create and implement appropriate IEPs for K.M.  Therefore, K.M. was indeed denied a FAPE when Defendants failed to develop appropriate IEPs and implement IEPs for K.M. during both the 2019-20 and 2020-21 school years. Furthermore, Defendants did not sustain the burden of persuasion by a preponderance of the evidence with regard to K.M.'s April 2021 IEP, that it was appropriate and reasonably calculated to enable Student to make progress in light of the Student's circumstances. So, the process, hearing and H.O. decision was extremely prejudicial to the Student and Parent,

flawed and clearly erroneous, not regularly made, and the decision rendered should be overturned by this Court.

478.     The process was not regularly made in the underlying administrative litigation and the H.O. Decision was partially wrong when Defendants were given more latitude in questioning of witnesses than Plaintiffs. Therefore, the process was extremely prejudicial to the Student and Parent, flawed and clearly erroneous, and the decision rendered should be overturned by this Court.

479.     The process was not regularly made in the underlying administrative litigation and the H.O. Decision was partially wrong when unknown persons interrupted the hearing and was overheard by the parties having a conversation during the hearing.  This conversation was documented on the video and audio of the hearing.  Therefore, the process was extremely prejudicial to the Student and Parent, flawed and clearly erroneous, and the decision rendered should be overturned by this Court.

480.     The process was not regularly made in the underlying administrative litigation and the H.O. Decision was partially wrong when inadequate analysis was provided for an insufficient relief determination of 150 hours of independent academic tutoring for Plaintiff K.M. at the OSSE prescribed rate.  Whereas, two separate very credible experts testified and recommended in the underlying hearing considerably more compensatory services for K.M.   For instance, Ms. Jennifer Holmes, an expert accepted by the tribunal, recommended Defendants provide K.M. with a total of 354 hours of direct compensatory services (156 hours in math, reading and written expression, plus 18 hours of transition services, plus 72 hours of mental health counseling, plus 36 hours of speech therapy, plus 72 hours of instruction in adaptive skills by a certified teacher) which would have improved K.M.'s overall functioning in academic, social and language domains.  Moreover, Ms. Holmes testified further that she would have recommended much more compensatory services for K.M. but chose to be conservative given the administrative constraints of schools.  Ms. Dori Cook, an expert accepted by the tribunal, recommended for K.M. 1040

hours of academic tutoring support to complete missing work, plus 104 hours of weekly family counseling, plus 520 hours of transition services, plus a summer program or internship in her professional interests. And a third expert, reading expert Dr. Rebecca Felton, an expert accepted by the tribunal, indicated K.M.'s reading and written expression skills were well below grade level and it would take many years for K.M. to make up the reading and written expression skills that were not provided by Defendants to K.M.  In addition, significant educational services would be needed to make up for skills or learning that were lost when special education and related services in her IEPs were not provided. The Defendants failed to provide a cogent and responsive explanation as to why it denied K.M. the services identified as necessary to provide K.M. a FAPE as recommended by the Plaintiffs' experts.  Actually, H.O. Ruff did not provide a thorough and reasoned explanation as to why he ignored the Plaintiffs' expert's information and determined the May 2019 IEP was appropriate and that the Defendants materially implemented the May 2019 and April 2020 IEPs.  Therefore, the process was extremely prejudicial to the Student and Parent, flawed and clearly erroneous, and the decision rendered should be overturned by this Court.

481.     The process and proceeding was not regularly made in the underlying administrative litigation and the H.O. Decision was partially wrong when H.O. Ruff concluded that Plaintiffs did not sustain the burden of persuasion by the preponderance of the evidence that Plaintiff K.M. was denied a FAPE by denying Plaintiff D.B. an opportunity to meaningfully participate.  The testimonial and documentary evidence clearly showed that Plaintiff D.B.  requested Student's cumulative records during the 2020-21 SY and those records were not provided to parent in violation of the IDEA and parent was unable to meaningfully participate in her child's education. Parent did not have access to student records to advocate knowledgeably for student and to be well informed to participate knowledgeably at IEP meetings. Moreover, Parent was unable to intelligibly monitor student progress and to share student records with providers.  The evidence showed that Parent was unable to provide cumulative student records to experts conducting

evaluations of student in order to evaluate the whole student.  Nor was Parent able to provide

student records to advocates and third parties to help Parent to help K.M. access a FAPE. The

evidence also showed that undersigned counsel requested student cumulative records and were

not provided student cumulative records prior to hearing by Defendants in violation of the IDEA.

Therefore, the process, hearing and H.O. decision was extremely prejudicial to the Student and

Parent, flawed and clearly erroneous, and the decision rendered should be overturned by this

Court.

482.     The process and proceeding were not regularly made in the underlying administrative

litigation and the H.O. Decision was partially wrong when H.O. Ruff concluded that Plaintiffs

did not sustain the burden of persuasion by the preponderance of the evidence that Defendants

denied Student a FAPE by failing to materially implement K.M.s IEPs during SY 2019-20 and

SY 2020-21.  The testimonial and documentary evidence clearly shows that Student was not

provided all of the services and accommodations outlined in her IEPs during SY 2019-20 and SY

2020-21 and was not provided compensatory special education and related services by

Defendants.  The evidence showed that Defendants never held a meeting as required by DOE

guidance during COVID-19 to discuss compensatory education for K.M. The evidence showed

that K.M. regressed each year, academically performed well below grade level, and failed most

of her classes during 9th grade at FPCS and still was not provided ESY services during the

summers of 2020 and 2021. The evidence showed that a draft Functional Behavior Assessment

was finally prepared in Spring of 2021 but never implemented for the benefit of Student.  The

evidence showed that K.M. was entitled to but was not provided a 1:1 dedicated aide, transition

services, speech services, all of her counseling services, etc. from Defendants, but those services

were only partially implemented or not implemented at all. The Defendants did not provide a

cogent and responsive explanation as to why it continued to force Plaintiff K.M. into a virtual

learning environment where she was denied access to the thirty (30) hours of specialized

instruction outlined in her IEP when other school districts in the country were allowing students

to return to in-person learning.  The Defendants failed to provide a cogent and responsive

explanation as to why Plaintiff K.M. was forced to self-teach herself when the evidence was

clear that she was well below her grade level in reading, writing, math, and had low adaptive

behavior scores.  The Defendants failed to provide a cogent and responsive explanation as to

why it did not provide more direct, live instruction to Plaintiff K.M. during the 2020-21 school

year when it noticed she was regressing and as was required by her IEP. This evidence was

totally ignored by H.O. Ruff when he produced his H.O. decision.  Therefore, the process,

hearing and H.O. decision were extremely prejudicial to the Student and Parent, flawed and

clearly erroneous, and the decision rendered should be overturned by this Court.

483.        The process and proceeding were not regularly made in the underlying administrative

litigation and the H.O. Decision was partially wrong when H.O. Ruff concluded that Plaintiffs

did not sustain the burden of persuasion by the preponderance of the evidence that Defendants

denied Student a FAPE by failing to materially implement K.M.s IEP during SY 2019-20 and

SY 2020-21. The H.O. determined that since there was an adult in the house during the school

day, the Defendants were justified in not fully implementing K.M.'s IEPs.  The H.O. completely

ignored the evidence that K.M. was intellectually disabled, could not read, did not receive any

training on how to utilize a computer, could not independently complete work on her current

grade level, had receptive and expressive deficits, had adaptive behavior deficits, had significant

school avoidance behaviors, was in need of a one-on-one aide, was in need of direct speech

language services, was in need of a behavioral intervention plan, and had an inappropriate IEP

in place that did not address all of her needs.  The H.O. also conveniently neglected to discuss

how the Defendants had options to provide various supports to K.M., including hiring a private

one-on-one aide to assist her during the school day and ensure she was able to understand the

materials and attend her classes.  The H.O. conveniently left out of his inaccurate analysis that

the majority of the school week, K.M. was expected to complete her work independently and

navigate a virtual environment when she never received training on how to properly navigate the virtual learning environment.  The H.O. further failed to discuss the age, disability status, educational status, and purpose of the adult in the home during the 2020-21 school year.  There was no evidence that this particular adult assisted K.M. during the school day.  There was no evidence this adult knew how to navigate a computer.  There was no evidence this adult knew how to read.  There was no evidence that this adult knew how to complete math.  The purported adult did not testify at the hearing and was not subpoenaed to testify at the underlying administrative hearing.  Instead of critiquing and examining the ability of the purported adult, the H.O. simply makes a statement that an adult was in the home during the 2020-21 school year.  Basing his decision on the fact that an adult was in the home when K.M. was supposed to log in without more information is wrong and not regularly made.

In the H.O. Decision, H.O. states that "Albeit, School A did not make services available to Student to the same extent that they would have been available to Student had Student engaged in-person learning, the evidence demonstrates that the during the school week from 9:00 a.m. to 4:00 p.m. daily, four days per week, School A made instruction and services available to Student." First, the majority of the services offered four days of the week required an intellectual disabled child with a defective IEP to self-teach in a self-pace environment. Additionally, Defendants failed to provide services for six hours per week during the period of August 31, 2020 through June 17, 2021.[6]  That amounts to approximately thirty-eight (38) weeks of schooling.  Based on the H.O.'s analysis, K.M. was entitled to at least 28 hours of instruction per week.  However, the H.O. neglects to recognize that during those four days of instruction, K.M. was only entitled to receive some form of instruction from 9:00-1:30 pm or four hours per day for four days per week, which amounts to sixteen (16) hours of instruction per week.  For the sixteen hours, K.M. was only entitled to eight hours of direct instruction

---

[6] https://www.friendshipschools.org/wp-content/uploads/2020/08/Calendar.pdf.

despite her IEP requiring 30 hours of direct instruction.  As noted above, K.M. was entitled to

38 weeks x 30 hours of direct instruction per week which is 1,140 hours of instruction over a

38-week school year.  At most, K.M. received 304 hours of instruction (*i.e.*, 38 weeks times 8

hours per week=304).  As noted below in the April 2020 IEP, K.M. was entitled to receive 30

hours per week of specialized instruction in the special education setting:

**LEAST RESTRICTIVE ENVIRONMENT (LRE)**

*This section describes student needs that require removal from general education to receive the following special education and related services. Note: The nature and/or severity of the disability must be such that the student can only make progress on IEP goals and objectives by being removed from the general education classroom to receive these services.*

| Service | Time/Frequency | Reason services cannot be provided in general education setting |
|---|---|---|
| Specialized Instruction | 30 hr per wk | student requires pragmatic instruction in skills that are significantly below grade level that cannot be instructed in the general education classroom |
| Behavioral Support Services | 30 min per wk | student requires systematic cognitive behavioral therapy to address the organicity of social emotional impact on students metacognitive plasticity and learning. |

The Distance Learning Plan only provided for eight (8) hours of direct, specialized instruction to K.M.

during the 2020-21 school year as reflected below:

| | Name | Email | Phone Number |
|---|---|---|---|
| | Case Manager: Marcia Robertson | mrobertson@friendshipschools.com | 202-904-5466 |
| | Dedicated Aide: N/A | | (xxx) xxx-xxxx |
| | Special Education Coordinator: Tiffany Mason | | (301) 379-2728 |
| | All calls/texts/emails are returned 24 hours from the time of voicemail receipt. | | |

| | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY |
|---|---|---|---|---|---|
| | Self paced | Live | **VIRTUAL TUTORING 9:00-11am** | Self-Paced | Live |
| BLOCK 1 (PERIOD 1-2): 9:00-10:00am | Subject: Reading Lab<br>Teacher Name: Ms. Robertson<br>Zoom Link: 957 3777 3441<br>Password: Reading | Self paced<br>Teacher Name: Ms. Robertson<br>Zoom Link: 957 3777 3441<br>Password: Reading | | Subject: Reading Lab<br>Teacher Name: Ms. Robertson<br>Zoom Link: 957 3777 3441<br>Password: Reading | Subject: Reading Lab<br>Teacher Name: Ms. Robertson<br>Zoom Link: 957 3777 3441<br>: Reading |
| | Self-Paced | Live | | Self-Paced | Live |
| BLOCK 2 A (PERIOD 3-4): 10:00-11:00am | Subject: Algerba I<br>Teacher Name: Mr. Nwabineli<br>Zoom Link: 247 301 6566<br>Password: 917289 | Subject: Algerba I<br>Teacher Name: Mr. Nwabineli<br>Zoom Link: 247 301 6566<br>Password: 917289 | | Subject: Algebra I<br>Teacher Name: Mr. Nwabineli<br>Zoom Link: 247 301 6566<br>Password: 917289 | Subject: Algebra I<br>Teacher Name: Mr. Nwabineli<br>Zoom Link: 247 301 6566<br>Password: 917289 |
| | Live | Self-Paced | **STUDENTS SELF PACED ASSIGNMENTS** | Live | Self-Paced |
| BLOCK 2 B (PERIOD 3-4): 10:00-11:00pm | Subject: Literary Genres<br>Teacher Name: Mr. Johnson<br>Zoom Link: 701 099 8947<br>Password: Literary | Subject: Literary Genres<br>Teacher Name: Mr. Johnson<br>Zoom Link: 701 099 8947<br>Password: Literary | | Subject: Literary Genres<br>Teacher Name: Mr. Johnson<br>Zoom Link: 701 099 8947<br>Password: Literary | Subject: Literary Genres<br>Teacher Name: Mr. Johnson<br>Zoom Link: 701 099 8947<br>Password: Literary |
| | Self-Paced | Live | | Self-Paced | Live |
| BLOCK 4 (PERIOD 7-8): 11:00-12:00pm | Subject: Theater<br>Teacher Name: Ms. Rouse<br>Zoom Link: 958 0467 3076<br>Password: 392773 | Subject: Theater<br>Teacher Name: Ms. Rouse<br>Zoom Link: 958 0467 3076<br>Password: 392773 | | Subject: Theater<br>Teacher Name: Ms. Rouse<br>Zoom Link: 958 0467 3076<br>Password:392773 | Subject: Theater<br>Teacher Name: Ms. Rouse<br>Zoom Link: 958 0467 3076<br>Password: 392773 |
| | Live | Self-Paced | | Live | Self-Paced |
| BLOCK 5 (PERIOD 9-10): 12:00pm - 1:00pm | Subject: Biology<br>Teacher Name: Mrs. Odifa<br>Zoom Link: 515 245 7054<br>Password: 803980 | Subject: Biology<br>Teacher Name: Mrs. Odifa<br>Zoom Link: 515 245 7054<br>Password: 803980 | | Subject: Biology<br>Teacher Name: Mrs. Odifa<br>Zoom Link: 515 245 7054<br>Password: 803980 | Subject: Biology<br>Teacher Name: Mrs. Odifa<br>Zoom Link: 515 245 7054<br>Password: 803980 |
| | LIVE | LIVE | | LIVE | LIVE |
| BLOCK 3 (PERIOD 5-6) 1:00pm - 1:30pm<br>1:30pm - 2:00pm | Subject - ADVISORY<br>Teacher Name : Mrs. Odifa<br>Zoom Link: 515 245 7054<br>Password: 803980 | Subject - ADVISORY<br>Teacher Name: Mrs. Odifa<br>Zoom Link: 515 245 7054<br>Password: 803980 | | Subject - ADVISORY<br>Teacher Name: Mrs. Odifa<br>Zoom Link: 515 245 7054<br>Password: 803980 | Subject - ADVISORY<br>Teacher Name: Mrs. Odifa<br>Zoom Link: 515 245 7054<br>Password: 803980 |
| | LUNCH | LUNCH | LUNCH | LUNCH | LUNCH |
| 2PM - 4PM (MANDATORY EXTENDED HOURS) | EXTENDED HOURS SEE GOOGLE CLASSROOM | EXTENDED HOURS SEE GOOGLE CLASSROOM | | EXTENDED HOURS SEE GOOGLE CLASSROOM | EXTENDED HOURS SEE GOOGLE CLASSROOM |

1140 minus 304 equals 836 lost hours over the 2020-21 school year. A child with an Intellectual Disability and whom is unable to read on grade level will struggle immensely if she loses 836 hours of specialized instruction. The H.O. only provided 150 hours of compensatory services. To completely ignore the number of hours (836 lost hours) K.M. was denied direct, specialized instruction based on her unique needs is extremely problematic, not regularly made, and wrong. Plaintiffs presented sufficient, credible and adequate evidence regarding the failure to meaningfully implement the IEP but the H.O. ignored the evidence. Further, the Defendants failed to provide a cogent and responsive explanation as to why K.M. was not allowed to receive the full thirty hours of direct instruction, even in a virtual environment. The H.O. Decision was not regularly made, was wrong in many ways, and does not deserve deference.

83

484.      The process and hearing were not regularly made in the underlying administrative

litigation and the H.O. Decision was partially wrong when H.O. Ruff failed to find in favor of

Plaintiffs based on the inappropriate classification of K.M. as a student with an emotional

disability when she should have qualified as a student with an Intellectual Disability.  The

evidence indicated that the May 2019 psychoeducational evaluation showed that K.M. had an

overall IQ of 69, failing well below an average IQ score of 90.  Further, the May 2019

psychoeducational evaluation demonstrated that most of K.M.'s reading scores fell well below

an average score as indicated below:

## Total Reading Subtest Score Summary

| Subtests | Standard Score | Percentile Rank | Qualitative Description |
|---|---|---|---|
| Word Reading | 75 | 5 | Below Average |
| Pseudoword Decoding | 64 | 1 | Low |
| Basic Reading Composite | 70 | 2 | Below Average |
| Reading Comprehension | 75 | 5 | Below Average |
| Oral Reading Fluency | 92 | 30 | Average |
| Reading Comprehension & Fluency | 79 | 8 | Below Average |

Similarly, the May 2019 psychoeducational evaluation demonstrated that K.M.'s math scores fell

well below average as indicated below:

## Mathematics Subtest Score Summary

| Subtests | Standard Score | Percentile Rank | Qualitative Description |
|---|---|---|---|
| Math Problem Solving | 67 | 1 | Low |
| Numerical Operations | 64 | 1 | Low |
| Math Fluency | 68 | 2 | Low |

Like her reading and math scores, K.M.'s adaptive behavior scores were low based on results from her teacher as demonstrated below:

Teacher's Adaptive Behavior Scores

| *Adaptive Scales* | | | |
|---|---|---|---|
| Adaptability | 31 | 3 | At-Risk |
| Social Skills | 35 | 7 | At-Risk |
| Leadership | 34 | 5 | At-Risk |
| Study Skills | 36 | 10 | At-Risk |
| Functional Communication | 26 | 1 | Clinically Significant |

The Defendants failed to conduct additional evaluations to determine the need to conduct a functional behavior assessment, create a behavior intervention plan, and provide appropriate adaptive behavioral supports to K.M.  More importantly, the Defendants failed to properly classify her as a child with an Intellectual Disability.  Failing to properly classify her led to the creation of inappropriate IEPs resulting in a denial of FAPE and depriving Ms. Bond of the opportunity to meaningfully participate. The Defendants failed to provide a cogent and responsive explanation for their actions of failing to implement the IEPs. H.O. Ruff did not appropriately address this issue in the Decision.  Therefore, the process and hearing were extremely prejudicial to the Student and Parent, flawed and clearly erroneous, and the decision rendered should be overturned by this Court.

485.    The process and hearing were not regularly made in the underlying administrative litigation and the H.O. Decision was partially wrong when the H.O. inappropriately determined the Defendants fully implemented K.M.'s IEPs. K.M.'s April 9, 2021 and April 15, 2020 IEPs

indicate that she was entitled to 30 hours per week of specialized instruction, outside general education.  However, the evidence showed that K.M. did not receive 30 hours per week of specialized instruction, outside general education during the period of April 15, 2020, to June 2021. K.M.'s April 9, 2021, and April 15, 2020, IEPs indicate that she was entitled to 30 minutes per week of behavioral support services, outside general education. The evidence showed that K.M. did not receive 30 minutes per week of behavioral support services during the period of April 15, 2020 to June 2021.  This evidence was totally ignored by the H.O.  Further, the Defendants failed to provide a cogent and responsive explanation for their actions of failing to implement the IEPs. Therefore, the process and hearing were extremely prejudicial to the Student and Parent, flawed and clearly erroneous, and the decision rendered should be overturned by this Court.

486.       The process and hearing were not regularly made in the underlying administrative litigation and H.O. Decision was partially wrong.  The evidence shows that K.M. suffered from school avoidance/refusal behaviors which substantially increased during virtual instruction during the 2020-21 SY.  The evidence also shows that Defendants created a Distance Learning Plan ("DLP") for K.M., for Grade 9 during the 2020-21 SY which reduced the special education and related services implemented and provided to K.M. as was required by her IEPs during 9th grade at FPCS.  Therefore, during the 2020-21 SY, K.M. did not receive 30 hours per week of special education, 30 minutes per week of behavioral support services, 2.5 hours per month of transition services, 4 hours per month of speech-language services due to her school avoidance/refusal behaviors and the DLP reduction of special education and related services for K.M.  Nor did K.M. receive 8 hours per day of a dedicated aide.  Further, the Defendants failed to provide a cogent and responsive explanation for their actions of failing to implement K.M.'s IEP. However, this evidence was totally ignored by the H.O. Therefore, the process and hearing were extremely prejudicial to the Student and Parent, flawed and clearly erroneous, and the decision rendered should be overturned by this Court.

487.     The process and hearing were not regularly made in the underlying administrative

litigation and H.O. Decision partially wrong.  The evidence shows that K.M.s IEP was amended

in April, 2021 adding a new disability classification of intellectual disability, a dedicated aide for

8 hours per day, speech-language pathology services 4 hours per month and transition services.

However, the testimonial and documentary evidence showed that K.M. was not provided (1) a

dedicated aide 8 hours per day April 9, 2021, through June 2021, (2) was not provided speech

language services 4 hours per month April 9, 2021, through June 2021, and (3) was not provided

transition services during the 2020-21 SY. Further, the Defendants failed to provide a cogent and

responsive explanation for their actions of failing to implement the IEP. But this evidence was

totally ignored by H.O.  Therefore, the process and hearing were extremely prejudicial to the

Student and Parent, flawed and clearly erroneous, and the decision rendered should be

overturned by this Court.

488.     The process and proceeding were not regularly made in the underlying administrative

litigation and H.O. Decision partially wrong when H.O. concluded that Defendants did sustain

the burden of persuasion by the preponderance of the evidence because Student's April 2021 IEP

was reasonably calculated to enable Student to make progress appropriate in light of Student's

circumstances. The evidence shows that K.M.'s 2019 and 2020 IEPs were substantially identical,

and she did not make not progress on her IEP goals.  The April 2021 IEP relied heavily on the

2019 and 2020 IEPs which were not reasonably calculated to enable K.M. to make progress in

light of her circumstances.  The evidence showed that K.M. had communication deficits at the

time of the creation of the May 2019 IEP but those communication deficits were not addressed in

the May 2019 IEP.  Further, the evidence also showed that K.M. had additional areas of reading

that negatively impacted her ability to access the general education curriculum, but the

Defendants refused to create IEP goals and provide services to address those reading deficits in

the May 2019 IEP.  The evidence also showed that K.M. had additional social-emotional needs

that required the creation of a behavioral intervention plan, but the Defendants failed to create a

behavioral intervention plan for K.M. when it created the May 2019 IEP.  The Defendants failed to provide a cogent and responsive explanation for their actions of failing to create an appropriate IEP and ignoring clear areas of need when it created the May 2019 IEP. Therefore, the process, hearing and H.O. decision was extremely prejudicial to the Student and Parent, flawed and clearly erroneous, and the decision rendered should be overturned by this Court.

489.    The process and proceeding were not regularly made in the underlying administrative litigation and H.O. Decision partially wrong when H.O. concluded that Defendants did sustain the burden of persuasion by the preponderance of the evidence because Student's April 2021 IEP was reasonably calculated to enable Student to make progress appropriate in light of Student's circumstances. The evidence shows that K.M.'s 2019 and 2020 IEPs were substantially identical, and she did not make not progress on her IEP goals.  The evidence also showed that K.M. performed academically well below grade level in reading, writing and math in 8th and 9th grades at FPCS.  However, her April 2021 IEP contained annual goals and PLAAFP for a student performing on the 9th grade level academically in math, reading, written expression. Therefore, K.M.'s April 2021 IEP was not individualized for her unique needs and was not reasonably calculated to enable K.M. to make progress appropriate in light of her circumstances. Moreover, Defendants were not providing K.M. a level of instruction reasonably calculated to permit advancement of K.M. through the general curriculum.  But this evidence was totally ignored by H.O.  Therefore, the process, hearing and H.O. decision was extremely prejudicial to the Student and Parent, flawed and clearly erroneous, and the decision rendered should be overturned by this Court.

490.    The H.O. inappropriately failed to provide appropriate weight to the Plaintiffs' witnesses, particularly the expert witnesses, on one of the critical issues which was wrong and not regularly made resulting in a partially wrong decision.  First, the H.O. determined the April 2021 IEP was appropriate partially because the Plaintiffs' expert witnesses failed to critique and challenge K.M.'s new school's implementation of the April 2021 IEP.  There were five expert witnesses

with various levels of expertise.  Instead of individually assessing the credibility of each expert witness on this sole issue, the H.O. simply stated that "The testimony of Petitioner's witnesses was not credible in this regard, as they never personally observed or worked with Student and did not review any educational records or progress reports from Student's current LEA that would speak to the effectiveness or ineffectiveness of the April 2021 IEP." The H.O. completely ignores Plaintiff D.B.'s testimony on this issue and discounts any information she provided related to this issue.  The H.O. also ignores K.M.'s testimony on this issue.  The Plaintiffs' expert witnesses primarily focused on whether the May 2019, April 2020, and April 2021 IEPs were appropriate at the time of their creation.  The H.O.'s analysis of this issue requires expert witnesses to not only assess the appropriateness of IEPs at the time of creation but also after implementation, even if the implementation is at a completely different school or school year and not an issue.  K.M.'s new school was not the defendant in the underlying administrative matter.  More importantly, the H.O. could have subpoenaed members of K.M.'s current school to testify or directed Plaintiffs to identify witnesses from K.M.'s new school to testify.  This extremely high burden is not supported by law or policy.  Without appropriate credibility determinations, Plaintiffs have a difficult time challenging the H.O. Decision because each witness was deemed not credible, even K.M.  Further, the H.O. does not cite to a policy, regulation, or statute that requires Plaintiffs to produce witnesses that have observed or reviewed educational records subsequent to the development of an IEP if the child is no longer a member of the Defendant's school.  The H.O. had sufficient evidence that K.M. continued to regress significantly after the development of the April 2021 IEP but he simply ignored that evidence.  The H.O. determined the Defendants witnesses were more credible than Plaintiffs witnesses on this issue but there was no evidence that any of the Defendants' witnesses observed K.M. in her new school, reviewed her educational records from the new school, or IEP progress reports from the new school.  The H.O. simply gave the Defendants' witnesses more credibility on this issue without requiring more.  As such,

the H.O.'s decision on this issue was wrong, not regularly made, and should not be provided deference.

**2) The Defendants Did Not Sustain Their Burden of Persuasion by a Preponderance of Evidence that K.M.'s May 2019 and April 2021 IEPs were Appropriate**

491.     Plaintiffs incorporate all preceding paragraphs into this Count by reference as if fully stated herein.

492.     Plaintiffs are a "party aggrieved" by the H.O. Decision within the meaning of 20 U.S.C. §1415(i)(2)(A).

493.     Plaintiffs assert that H.O. Decision is wrong as it relates to the appropriateness of the K.M.'s April 2021 IEP.

494.     The evidence overwhelmingly demonstrated Defendants denied K.M. a FAPE by failing to develop appropriate IEPs reasonably calculated to enable her to make progress appropriate in light of her circumstances during SY's 2020-21.

495.     "The IEP must aim to enable the child to make progress. ... The essential function of an IEP is to set out a plan for pursuing academic and functional advancement." *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 999 (2017). "A focus on the particular child is at the core of the IDEA. The instruction offered must be '*specially* designed' to meet a child's '*unique* needs' through an "[*individualized* education program." *Id*.

496.     Defendants knew of K.M.'s specific academic, functional, behavioral, and social-emotional needs but failed to develop appropriate IEPs to address her needs. Specifically, Defendants knew K.M. had poor decoding and word reading skills but did not ensure the first two IEPs appropriately addressed those specific needs. More specifically, the May 2019 and April 2020 IEPs did not address word reading or decoding via IEP goals, related services, accommodations, supplementary aides, modifications, or specially designed instruction despite those being K.M.'s lowest reading scores.  K.M. made little to no progress in the area of math

problem solving, math fluency, numerical operations, written expression, fluency, reading decoding and word reading from May 2019 until June 2021. The Defendants did not appropriately address K.M.'s word reading and decoding deficits between May 2019-April 2021.

497.     At the May 2019 IEP meeting, the IEP team had information that K.M. had poor adaptive behavior skills but did not advise Plaintiff D.B. to request an adaptive behavior assessment ("ABA") and/or consider K.M. for Intellectual Disability.

498.     The May 14, 2019, psychological evaluation did not include an ABA.

499.     Despite not conducting an ABA, the BASC-3 conducted by the teacher indicated at-risk to clinically significant scores for K.M. in the area of adaptive behavior. Only after Plaintiff D.B. made a specific request for an ABA, did K.M. receive an ABA, almost two years after her initial assessment despite the Defendants having sufficient evidence of the need for an ABA.

500.     Once the ABA was conducted, the Defendants found K.M. eligible for special education services under the Intellectual Disability category.

501.     K.M. went at least two years with inappropriate IEPs and services.

502.     K.M. was denied a FAPE and regressed as a result of not receiving appropriate services.

503.     The May 2019 and April 2020 IEPs were not appropriately developed to provide K.M. with a FAPE. The IEP goals for both IEPs repeated. Many of the IEP goals did not address her specific needs as outlined in the psychological evaluation. The present levels of academic achievement and functional performance repeated over the first two IEPs.  One of the behavior IEP goals required her to serve a client despite her limited progress. The transition goals were not appropriate to meet her needs and she did not make progress on those goals. There were no speech-language, word reading, decoding, behavior goals addressing school avoidance behaviors, assistive technology goals, or other goals and services appropriate to meet her needs. The May 2019 and April 2020 IEPs inadequately met K.M.'s needs resulting in a denial of FAPE.

504.     "In the case of a child whose behavior impedes the child's learning or that of others,

consider the use of positive behavioral interventions and supports, and other strategies, to

address that behavior." 34 C.F.R. § 300.324(a)(2(1).

505.     The evidence demonstrated that between March 2020 through June 2021, K.M. suffered

with significant attendance and school avoidance issues but the IEP was not revised until April

2021. Even when the IEP was revised, it did not directly address K.M.'s school withdrawal or

school avoidance behaviors. The April 2021 IEP indicated she was entitled to a dedicated aide

for 8 hours per day but there was insufficient evidence an aide was provided as K.M. testified

she did not know of a dedicated aide and the Defendants speech therapist testified she never

knew or met a dedicated aide for K.M..

506.     K.M.'s IEPs did not appropriately provide for extended school year services for the 2020

or 2021 summers. The evidence showed that the Defendants failed to consider and properly

document its basis for denying K.M. ESY for the 2020 and 2021 summers.  The evidence

overwhelmingly indicated that K.M. had deficits that would be jeopardized over the summer

break. The IEP Team begins the ESY determination process by considering whether the break in

service will jeopardize one or more critical skills. *See* 34 C.F.R. §300.106(b)(1) 2 34 C.F.R.

§300.106(a)(3) 3 34 C.F.R. §300.106(a)(2); 34 C.F.R. §300.324(b)(1)(i) 4. The evidence

indicates that reading, writing and math are critical life skills for a student's overall academic

success. Non-academic skills also include social, functional, and behavioral skills that have a

direct educational impact. The IEP Team is required to describe the educational impact of the

break in service on any identified critical skill and to support any identified concerns with

student data. The IEP Team must consider the degree of regression that the student will

experience in any critical skill identified as potentially jeopardized by the break in service. The

Defendants failed to properly consider K.M.'s regression related to the 2020 and 2021 summers

denying K.M. ESY services both summers despite the need for ESY services. K.M. was denied

a FAPE when she was not provided with ESY services.

507.     "[T]he IEP team must, in the case of a child whose behavior impedes the child's learning

or that of others, consider the use of positive behavioral interventions and supports, and other

strategies, to address that behavior.' 34 C.F.R. § 300.324(a)(2)(i). "[A] student may be denied

a FAPE if his educational plan does not contain sufficient interventions to adequately address

attendance issues." *Middleton v. D.C.*, 312 F. Supp. 3d 113, 146 (D.D.C. 2018).

508.     From August 2020 through June 2021, K.M. had significant school avoidance and

attendance issues. The Defendants did not attempt to create a behavioral intervention plan

(BIP) until some point after March 2021 and only after Plaintiff D.B. requested updated

assessments.  By the time the BIP was attempted, K.M. had regressed due to behavior but the

IEP was not revised between August 2020 through March 2020.

509.     Actually, K.M.'s school avoidance behaviors worsened as the year went by causing her

to miss critical time and instruction. Further, the BIP was never completed and provided to

Plaintiff D.B. or K.M. The BIP did not directly address the school avoidance behaviors.

K.M.'s IEPs failed to appropriately address her attendance and school avoidance behaviors

causing significant regression and resulting in a denial of FAPE.

510.     The May 2019 psychoeducational evaluation indicated K.M. had communication

deficits. K.M. was not assessed in the area of speech-language until Plaintiff D.B. made a

request two years after the initial IEP meeting.  Plaintiffs' speech-language expert, Ms. Minelli,

testified extensively about the information the Defendant had about K.M. indicating the need for

a speech-language evaluation at the May 2019 IEP meeting. Despite having ample information

of the need of speech-language services, those services were not available to K.M. until April

2021. Even when the services were available, she did not make progress because the dedicated

aide was not provided to her to ensure she attended her speech sessions. As a result, K.M. was

denied a FAPE when she went without speech therapy for the period of May 2019 through April 2021, and when she was not provided support to receive the speech services from April 2021 through June 2021.

**3) Plaintiffs Sustained Their Burden Of Persuasion By A Preponderance Of The Evidence That Defendant Denied K.M. A FAPE By Failing To Materially Implement K.M.'S IEPs During The 2019-20 And 2020-21 School Years**

511.   Plaintiffs incorporate all preceding paragraphs into this Count by reference as if fully stated herein.

512.   Plaintiffs are an "party aggrieved" by the H.O. Decision within the meaning of 20 U.S.C. §1415(i)(2)(A).

513.   Plaintiffs assert that the H.O. Decision is wrong as it relates to failing to materially implement K.M. IEP.

514.   "[A] party challenging the implementation of an IEP must show more than a *de minimis* failure to implement all elements of that IEP, and, instead, must demonstrate that the school board or other authorities failed to implement substantial or significant provisions of the IEP. *Wilson v. D.C.*, 770 F. Supp. 2d 270, 274 (D.D.C. 2011). "[A] court reviewing failure-to-implement claims under IDEA must ascertain whether the aspects of the IEP that were not followed were 'substantial or significant,' or, in other words, whether the deviations from the IEP's stated requirements were 'material.' *Id*. "A material failure occurs when there is more than a minor discrepancy between the services a school provides to a disabled child and the services required by the child's IEP." *Id*. at 275.

515.   The IEP was not followed during the period of March 2020 and June 2020. Actually, there were weeks that went by when K.M. received no services at all during the period of March 2020 and June 2020.

516.     Plaintiffs proved beyond a preponderance of evidence that during the period of August 2020 through June 2021, K.M. did not receive the special education and related services outlined in her IEPs. During the 2020-21 school year, K.M. was entitled to 30 hours of specialized instruction in the special education environment but received only approximately 12 out of 30 hours per week as indicated by K.M. and the Defendants own witnesses.

517.     The Defendants witnesses could not specifically identify how much time they actually provided K.M. with direct instruction in a special education setting during the period of August 2020 through June 2021. The Defendants witness simply stated that they would go into the virtual room and leave.

518.      K.M. needed direct, explicit instruction but was forced to attempt to learn on her own during most of the 2020-21 school year.  As a consequence, she lost thousands of hours of special education instruction.

519.     K.M. was also entitled to a one-on-one aide for eight hours per day but did not receive that service.

520.     The Defendants failed to produce any documentary evidence that K.M. actually received the support from the aide. Actually, the Defendants speech-language therapist testified that the aide never showed up at her sessions.

521.     Despite regressing, K.M. was not provided with ESY during the 2020 or 2021 summers.

522.     K.M. also did not receive sufficient transition services and supports. There was no evidence that the accommodations or transition services identified in K.M.'s IEPs were ever implemented.

### 4) **Plaintiffs Sustained Their Burden Of Persuasion By A Preponderance Of The Evidence That Defendant Denied K.M. A FAPE By Denying Plaintiff D.B. An Opportunity To Meaningfully Participate During SY 2019-20 And SY 2020-21**

523.     Plaintiffs assert that the H.O. Decision is wrong as it relates to Defendant denying Plaintiff an opportunity to meaningfully participate.

524.     "[T]he IDEA establishes procedural safeguards that provide parents with 'both an opportunity for meaningful input into all decisions affecting their child's education.'" *Middleton v. D.C.*, 312 F. Supp. 3d 113, 122 (D.D.C. 2018).

525.     Plaintiff D.B. was denied an opportunity to meaningfully participate in the May 2019, April 2020, March 2021, and April 2021 IEP meetings. Plaintiff D.B. attended the May 2019 IEP meeting but was not informed that K.M. could have received an adaptive behavior assessment to determine her eligibility for Intellectual Disability classification.

526.     Plaintiff D.B. was never appropriately informed about the ESY process and how K.M. needed ESY to make progress during the 2020 and 2021 summers. The Defendants failed to complete the ESY process as required under DC law. The Defendants failure to provide Plaintiff D.B. with this information delayed K.M. from receiving the appropriate supports and services for at least two years.

527.     At the April 2020 IEP, Plaintiff D.B. was not informed that repeating the exact same IEP goals indicated a lack of progress and denial of FAPE. As a result, she was not aware that she could have requested additional supports and services and therefore denied the opportunity to meaningfully participate at that IEP meeting. Similarly, at the first April 2021 IEP meeting, she made specific requests for evaluations but was told that she could only receive certain evaluations. Further, she was not informed that she could request independent education evaluations.

528.     At the second April 2021 IEP meeting, Plaintiff D.B. was not made aware of the specific supports and services K.M. could have been provided to directly address her school withdrawal/avoidance behaviors.

529.     Plaintiff D.B. was never provided a copy of the BIP and other records outside of this

litigation. Moreover, Plaintiff D.B. was not informed that she had a right to receive and review

the relevant records prior to the aforementioned IEP meetings and was not prepared as a result.

530.     Plaintiff D.B. was denied the opportunity to meaningfully participate despite K.M.'s lack

of progress resulting in a denial of FAPE.


### 5)  COVID 19-Crisis Did Not Excuse Material Failure to Implement IEP During the 2019-20 and 2020-21 School Year.

531.     Defendants did not ensure K.M. was provided the special education and related

services identified in K.M.'s IEP for the period of March 2020 through June 2021.

532.     The special education and related services were not implemented for K.M. during

the period of March 2020 through June 2021.

533.     At no point between April 2020 through June 2021 did Defendants convene an IEP

meeting to discuss compensatory services and to decide whether compensatory services

were needed for K.M. under applicable standards and requirements.

534.     K.M. was entitled to thirty (30) hours per week of specialized instruction in her 2019,

2020 & 2021 IEPs for the period of March 2020 to June 2021.

535.     K.M. was entitled to receive the 30 hours in a classroom based on her individualized

unique needs.

536.     K.M. was also entitled to receive that specialized instruction in an environment where she

would have access to her special education teacher when in need of support.

537.     K.M. was deemed in need of that specialized setting based on her educational needs.

538.     The Defendants created a distance learning plan despite her IEP indicating she needed

thirty (30) hours of specialized instruction in a setting where she could get direct instruction and

support in-person from a special education teacher based on her IEP.

539.       The distance learning plan substantially and materially deviated from her May 2019 and

April 2020 IEPs which identified her least restrictive environment in a specialized setting for 30

hours per week.

540.       The distance learning plan created by Defendants for virtual instruction during the 2020-

21 school year only made available to K.M. twelve (12) hours of direct instruction and that direct

instruction was not provided in her least restrictive environment ("LRE").

541.       There was no evidence provided by Defendants which demonstrated K.M. was provided

with 30 hours of specialized instruction in her LRE between March 2020 and June 2020.  The

evidence indicated K.M. was not provided with 30 hours of specialized instruction per week

according to her IEP from August 2020 to June 2021. Therefore, the IEP team was required to

decide whether compensatory education was needed for K.M.  Defendants did not offer any

evidence during the underlying administrative hearing that it had directed the student's IEP team

to decide whether compensatory education was needed for the K.M. Despite this evidence, the

H.O. did not award appropriate relief in compensatory education based upon the experts'

testimony and reports.  Therefore, the process, hearing and H.O. decision was extremely

prejudicial to the Student and Parent, flawed and clearly erroneous, and the decision rendered

should be overturned by this Court.


## COUNT II

(Attorney's Fees, Costs, Expert Witness Fees, and Litigation Costs)

542.       Plaintiffs incorporate all preceding paragraphs into this Count by reference as if fully stated

herein.

543.       Plaintiffs are "prevailing parties" in the administrative proceedings on one of the three

issues before H.O. Ruff.

544.     H.O. Ruff concluded that Defendants deprived Student of a FAPE on one of the three issues

before the tribunal for:

Issue 1: Defendants failed to develop an appropriate April 15, 2020 IEP that was reasonably calculated

to enable Student to make progress appropriate in light of Student's circumstances.  Defendants did

not sustain their burden of persuasion by a preponderance of the evidence on this issue.

545.     H.O. Ruff lacked subject matter jurisdiction on whether Plaintiffs rights were denied by

Defendants violation of section 504 of the Rehabilitation Act of 1973 and violation of Title II of

the ADA.

546.     As the prevailing party in the due process proceeding, the IDEA provides that Plaintiffs

may seek reimbursement for their reasonable attorneys' fees (including costs), subject to the

discretion of this district court.

547.     Moreover, D.C. Code Ann. § 38-2571.03(7)(A) explicitly states that a prevailing party may

be awarded expert witness fees as part of its costs.

548.     Plaintiffs reserve the right to amend this claim for relief to include a request for

reimbursement of additional reasonable attorneys' fees (including costs), again subject to the

discretion of this district court, which are incurred in this instant proceeding should Plaintiffs be

designated as a prevailing party.

## **PRAYER FOR RELIEF**

NOW WHEREFORE, Plaintiffs respectfully request that judgment be entered in their favor and

against Defendants, and that this Court issue an Order:

a) Enter declaratory judgment that K.M. was entitled to compensatory services for special

education and related services not provided to K.M., for denying Plaintiff D.B. the

opportunity to meaningfully participate, and for failing to materially implement K.M.'s

IEPs during the 2019-20 and 2020-21 school years as recommended by the Plaintiffs' expert witness, Ms. Dori Cook;

b) Enter declaratory judgment reversing H.O. Ruff's Decision that K.M.'s May 2019 and April 2021 IEPs were appropriate and award compensatory services recommended by the Plaintiffs' expert witness, Ms. Dori Cook.

c) Enter declaratory judgment that the Plaintiffs are prevailing parties in this matter;

d) Award all attorney's fees, costs, expert witness fees and costs for the administrative hearing and all attorney's fees, costs, and expenses for the instant action;

e) Award compensatory education services for the H.O.'s failure to find K.M. entitled to compensatory services for the 2019-20 and 2020-21 school years;

f) Order Defendants to reimburse Plaintiffs for all costs and expenses incurred in litigating this matter including, but not limited to: expert witness fees, depositions, and court costs;

g) Award Plaintiffs all attorneys' fees and costs, including litigation expenses and costs, incurred in litigating all claims raised under the fee-shifting provisions of the IDEA; and

h) Award any other relief this Court deems just and proper.

## **JURY DEMAND**

Now Come the Plaintiffs, K.M., a minor, and Danielle Bond individually and on behalf of K.M., by and through their attorneys, The Harvey Law Group, PLLC and The Law Offices of Keith L. Howard, PLLC, and demand a trial by jury.

Respectfully submitted, this the 16th day of July 2022.

Danielle Bond, as Parent and Next Friend of K.M.,
By Counsel

THE HARVEY LAW GROUP, PLLC

___/s/ Stephenson Harvey
Stephenson Harvey, Esq.
Bar No.: 495345

The Harvey Law Group, PLLC
P.O. Box 434
Dunkirk, MD 20754
O:202-291-2914
F: 888-858-1941
E: sharvey@theharveylawgroup.com
W: www.theharveylawgroup.com
Attorney for Plaintiffs

&

THE LAW OFFICES OF KEITH L. HOWARD, PLLC

/s/Keith Howard
Keith Howard
Bar ID: 1617492
The Law Offices of Keith L. Howard, PLLC
19109 W. Catawba Ave. Ste. 200
Cornelius, NC 28031
O: (919) 824-0146
F: 800-341-3931
E: keithh@khowardlaw.com
W: www.khowardlaw.com
Attorney for Plaintiffs